**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AMERICAN BIO MEDICA CORPORATION

               Plaintiff,

   v.                              1:17-cv-302
                                    (TJM/DJS)

TODD BAILEY, APRIL BAILEY, PREMIER BIOTECH,
INC., PREMIER BIOTECH LABS, LLC, and
PECKHAM VOCATIONAL INDUSTRIES, INC.

               Defendants.

_____

**Thomas J. McAvoy, Sr. U.S.D.J.**

## DECISION & ORDER

Before the Court are Defendants' motions to dismiss this matter alleging breach of contract and interference with contractual relations. See dkt. #s 15, 16. Defendants contend that the Court lacks personal jurisdiction over them and the case should therefore be dismissed. They also allege that, even if the Plaintiff has properly pled jurisdiction, Plaintiff has failed to state a claim upon which relief could be granted. In responding to that motion, Plaintiff also sought a preliminary injunction against Defendant Todd Bailey. Subsequent to the filing and briefing of those motions, Plaintiff moved for leave to "supplement" the Complaint. The parties have briefed the issues. For reasons that shall become clear, the Court will address only the issue of personal jurisdiction at this time.

## I.    BACKGROUND

Plaintiff filed the instant action in the Supreme Court of Columbia County, New York

1

on or about February 27, 2017.  See Notice of Removal, dkt. # 1, at ¶ 2.  Defendants Todd

Baily, April Bailey, Premier Biotech Inc., and Premier Biotech Labs, LLC ("the Premier

Defendants") filed a notice of removal in this Court on March 16, 2017, contending that

diversity jurisdiction existed because the Defendants and Plaintiff were from different

states and the amount in controversy exceeded $75,000.  Id. at ¶ 4.  After the Premiere

Defendants removed the case to this Court, they filed the instant motion to dismiss.  See

dkt. # 15.  The remaining Defendant, Peckham Vocational Industries, Inc. ("Peckham"),

also filed a motion to dismiss.  See Dkt. # 16.

　　　The Complaint filed by Plaintiff American Biomedica Corporation ("AMBC") alleges

that AMBC is a New York corporation with its principal place of business in the Town of

Stuyvesant, Columbia County, New York.  Complaint, dkt. # 2, at ¶ 1.  AMBC's business

involves "developing, manufacturing, and marketing accurate, cost-effective immunoassay

test kits and point of collection tests for drugs of abuse."  Id. at ¶ 2.

　　　Defendants Todd Bailey and April Bailey reside in Shorewood, Minnesota.  Id. at ¶¶

3-4.  Todd Bailey is President of Defendant Premier Biotech, Inc. ("Premier") and April

Bailey is Premier's Chief Executive Officer.  Premier is a Minnesota corporation, with a

principal place of business in Chanhasssen, Minnesota.  Id. at ¶ 5.  Premier's business

involves products and services similar to those AMBC offers.  Id.

　　　Plaintiff also alleges that Defendant Premier Biotech Labs, LLC ("Premier Labs") is

a Minnesota company, with a principal place of business in the City of Cottage Grove,

Minnesota.  Id. at ¶ 6.  Premier Labs offers products and services similar to those of

Biomedica.  Id.  Plaintiff alleges that Todd Bailey manages Premier Labs.  Id.

　　　Defendant Peckham Vocational Industries, Inc. ("Peckham"), is a Michigan non-

2

profit corporation with its principal place of business in Lansing, Michigan.  Id. at ¶ 7.

This case arises out of Todd Bailey's employment with AMBC.  Plaintiff alleges that

Bailey worked for AMBC from April 2001 until December 23, 2016, either as an employee

or a "consultant."  Id. at ¶ 8.  He held various titles, including Vice President of Sales and

Marketing.  Id.  Bailey occupied a senior management position with the company, and

earned more than $200,000 a year.  Id. at ¶ 9.  His position gave him "access to

propreitary and confidential information regarding the Plaintiff's contracts, pricing, product

costs, internal sales strategies, legal and regulatory procedures, and competitive positions

within the Plaintiff's industry."  Id.  Bailey represented AMBC in business matters in the

United States and Europe.  Id. at ¶ 10.  He regularly attended trade shows for the Plaintiff

at Plaintiff's expense.  Id.

Plaintiff complains of events related to a contract that AMBC had with the Michigan

Department of Corrections ("DOC").  Id. at ¶ 11.  Pursuant to that contract, Plaintiff had

supplied DOC with drug-testing kits for more than fourteen years.  Id.  Plaintiff gained

between $800,000 and $1 million gross yearly revenue from that contract.  Id.  Bailey,

during his employment and consulting arrangement with the Plaintiff, was responsible for

managing Plaintiff's contract with the DOC.  Id. at ¶ 12.

In 2012, however, DOC informed Plaintiff that state regulations required DOC

publically to request proposals for future contracts.  Id. at ¶ 13.  Contracts could not be

automatically renewed.  Id.  If, however, Plaintiff supplied products through a Community

Resource Organization ("CRO") that DOC deemed a "worthy supplier," then the contract

could be renewed without a request for proposals.  Id.  Plaintiff therefore began in 2012 to

develop a relationship with Peckham, intending that Peckham would package products

3

supplied by Plaintiff and distribute them to DOC.  Id. at ¶ 14.  Todd Bailey served as the

primary contact with Peckham.  Id. at ¶ 15.  Over an extended period, Plaintiff expended

significant funds, resources, and energy to make sure that Peckham could package

Plaintiff's products and distribute them to DOC properly.  Id. at ¶ 16.  Eventually, Peckham

became a "worthy supplier" by meeting the DOC standard.  Id.  During this period of

development, DOC extended Plaintiff's contract "by exception."  Id.

Plaintiff terminated its consulting relationship with Todd Bailey on December 23,

2016.  Id. at ¶ 18.  In January 2017, anticipating a request for proposal from DOC, Plaintiff

contacted Peckham to work on such a proposal.  Id. at ¶ 19.  Plaintiff had multiple

conversations with Peckham that month, and Defendant Peckham never indicated that it

did not intend to continue its relationship with Plaintiff.  Id.  DOC issued a request for

proposals on February 3, 2017.  Id. at ¶ 20.  Responses to the request were due by March

3, 2017.  Id.  On February 10, 2017, Peckham informed Plaintiff that Peckham's proposal

would name Premier and Premier Labs as the supplier of the products Peckham would

package and distribute.  Id. at ¶ 21.  Plaintiff could not, in the brief time that remained until

the proposals were due, find another CRO to package and distribute its products to DOC.

Id. at ¶ 22.  A proposal that lacks a CRO is at a significant disadvantage.  Id. at ¶ 23.

Plaintiff's original Complaint contains five counts.  Count One alleges that Todd

Bailey violated a confidentiality provision in his employment contract with Plaintiff, and

seeks an injunction to prevent him from sharing any of Plaintiff's proprietary information.

Count Two alleges that Todd Bailey breached his contract by using proprietary information

obtained during his employment to solicit business with Peckham.  Count Three alleges

that Todd Bailey misappropriated Plaintiff's trade secrets.  Count Four, raised against April

4

Bailey, Premier, and Premier Labs alleges that these defendants tortiously interfered with Plaintiff's contractual relationship with Peckham.  Count Five, raised against April Bailey, Premier, Premier Labs, and Peckham, alleges unjust enrichment through the use of Plaintiff's trade secrets to obtain a contract to supply tests to the DOC.  The proposed Amended Complaint alters these final two counts by adding Todd Bailey as a Defendant.

After removing the case to this Court, Defendants filed the instant motions to dismiss, which seek dismissal on the basis that the Court lacks personal jurisdiction over the parties.  In the alternative, they claim, the Plaintiff has failed to state claims upon which relief could be granted.  After Plaintiff responded to these motions and moved for a preliminary injunction, Plaintiff filed a motion for leave to supplement its pleadings.  See dkt. #s 21, 25.  Defendants responded, arguing that the motion to supplement was futile. These respondents addressed only the proposed changes to the original Complaint, and the Court assumes that the question of personal jurisdiction persists as raised by the Defendants in response to the original Complaint.  The Court will therefore first consider the parties' initial arguments on personal jurisdiction, as granting those motions could moot the other issues.

## II.   LEGAL STANDARD

Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2). Federal Rule of Civil Procedure 12(b)(2) permits a defendant to move to dismiss the case for "lack of personal jurisdiction."  FED. R. CIV. P. 12(b)(2).   "The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss."  Whitaker v. American Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001).  When a party moves to dismiss a complaint for lack of personal jurisdiction

and the matter "is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." A.I. Trade Fin. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993). Though the Plaintiff has the burden of establishing jurisdiction, "where no evidentiary hearing has been held, the plaintiff need make only a prima facie showing of jurisdiction." Windfield v. C & C Trucking, 56 Fed. R. Serv. 3d at *5 (S.D.N.Y. 2003). Still, "'[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" APWU v. Potter, 343 F.3d 618, 627 (2d Cir. 2003) (quoting LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999)). The court "'retains considerable lattitude devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" Id. (quoting Phoenix Consulting, Inc. v. Republic of Angola, 342 U.S. App. D.C. 145, 216 F.3d 36, 40 (D.C. Cir. 2000)).

III.    **ANALYSIS**

A.    **Personal Jurisdiction**

The Premier Defendants argue that Todd Bailey, April Bailey, and Premier Labs are not subject to personal jurisdiction. They argue that New York law applies to this determination, and that New York law offers no basis by which the Court could exercise personal jurisdiction over them.

The question here is whether New York law and federal law permit an exercise of jurisdiction over the Defendants. "In the absence of a federal statute specifically directing otherwise, and subject to the limitations imposed by the United States Constitution, we

look to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation." Brown v. Lockheed Martin Corp., 814 F.3d 619, 624 (2d Cir. 2015). "'[T]he court must look first to the long-arm statute of the forum state, in this instance New York.'" Whitaker, 261 F.3d at 208 (quoting Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir 1997)). If the long-arm statute permits jurisdiction, "the court must decide whether such exercise comports with the requisites of due process." Id. (internal citations omitted). A court that finds a lack of personal jurisdiction under state law need not reach the due process question. Id.

Defendants argue that they are not subject to the Court's personal jurisdiction, either as  parties present and doing business in the state, or by virtue of the "long-arm" statute. Defendants point to two sections of New York's Civil Practice Law and Rules ("CPLR") in raising this argument. The Court will address each section in turn.

### i.    CPLR § 301–General Jurisdiction

Defendants first argue that they cannot be subject to general jurisdiction because none of them have the requisite connections to the forum to be considering as "doing business" in the state. New York CPLR § 301 "provides for general jurisdiction over defendant corporations that are 'doing business' in New York." Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, etc., 937 F.2d 44, 50-51 (2d Cir. 1991). To be subject to jurisdiction on this basis, the corporation must have "engaged in a such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in the jurisdiction is warranted." Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y.2d 28, 33, 565 N.E.2d 488, 4909 (N.Y. 1990). "The test for 'doing business' is a 'simple and 'pragmatic one,' which varies in its application depending on the particular facts of each

case."  Id.  (quoting Laufer v. Ostrow, 55 N.Y.2d 305, 309-310 (1982).  A corporation must "[do] business" in the state "'not occasionally or causally, but with a fair measure of permanence and continuity so as to warrant a finding of its presence in this jurisdiction.'" Okeke v. Momah, 132 A.D.3d 648, 649, 17 N.Y.S.3d 746, 748 (2d Dept. 2015) (quoting Sedig v. Okemo Mtn., 204 A.D.2d 709, 710, 612 N.Y.S.2d 643 (1994)).  "Mere solicitation of business within New York will not subject a defendant to New York's jurisdiction." Mejia-Haffner v. Killington, Ltd., 119 A.D.3d 912, 913, 990 N.Y.S.2d 561, 563 (2d Dept. 2014).

In response, Plaintiff does not address the issue of general jurisdiction, instead arguing that Todd Bailey "conducted business" over a fifteen-year period in the State of New York and is subject to jurisdiction pursuant to NY CPLR § 302(a)(1).  The other Premier Defendants are subject to jurisdiction, Plaintiff claims, because of their connection to Bailey.  The Court reads Plaintiff's argument to concede that the Premier Defendants are not subject to general jurisdiction in New York and will not analyze that basis of jurisdiction further.  Plaintiff must therefore prove that Defendants are subject to jurisdiction on another basis.

### ii.    CPLR § 302(a)

Plaintiff instead contends that the Premier Defendants are subject to jurisdiction pursuant to New York's "long arm" statute, CPLR § 302(a).  "A defendant who is not 'doing business' in New York within the meaning of section 301 may be sued in New York on a lesser showing of forum contacts if the cause of action arises from those contacts." Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 763 (2d Cir. 1983).  Section 302(a) provides that "[a]s to a cause of action arising from any of the acts enumerated in this

section," the Court may exercise jurisdiction over a person or person's agent who:

> 1.  transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2.  commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> 3.  commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
> 4.  owns, uses or possesses any real property situated within the state.

CPLR § 302(a).

### a.    Todd Bailey

Plaintiff relies on Section 302(a)(1), "transaction of business" as the source of long-arm jurisdiction over Todd Bailey.  "The showing necessary for a finding that defendant 'transacted business' and is suable on a cause of action arising from that transaction is considerably less than that needed to establish defendant's 'doing business,' which renders the defendant subject to suit on even an unrelated cause of action." Hoffritz for Cutlery, Inc. v. Amjac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).  "It is well settled that in order for a court to obtain personal jurisdiction over a party under the 'transaction of business' [element] of § 302(a)(1), the party need not be physically present in the state at the time of service." Bank Brussles Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999).  Instead, a party must have "'purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws[.]'" Id. (quoting Parke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 18, 308

N.Y.S.2d 337, 256 N.E.2d 506 (1970)).

Courts examining this provision have applied a number of "factors . . . in determining whether an out-of-state defendant transacts business in New York, including":

> (i) whether the defendant has an on-going contractual relationship with the New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004) (quoting Agency Rent A Car Sys., Inc. v. Grand Rent a Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)). "Although all factors are relevant, no one factor is dispositive and all factors may be considered." Id. "'The ultimate determination is based on the totality of the circumstances." Id. (quoting Agency Rent A Car, 98 F.2d at 29).

A Plaintiff may be subject to long-arm jurisdiction through Section 302(a)(1), but only if the cause of action in question arises out of that business. Courts have "concluded 'that it was the purpose of CPLR 302 to extend the jurisdiction of our State courts to nonresidents who have 'engaged in some purposeful actility [here] . . . in connection with the matter in suit[.]'" Ferrante Equipment Co. v. Lasker-Goldman Corp., 26 N.Y.2d 280, 284, 309 N.Y.S. 2d 913, 916 (1970) (quoting Longines-Wittnauer Watch Co. v. Barnes & Reinecke, 15 N.Y.2d 443 (1965)). Even one transaction can invoke jurisdiction, "so long as the relevant cause of action arises from that transaction." Id. Jurisdiction exists when "the defendant's activities" in the state "'were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" Chole v. Queen Bee of

10

Beverly Hills, LLC, 616 F.3d 158, 170 (2d Cir. 2010) (quoting Kreutter v. McFadden Oil

Corp., 71 N.Y.2d 460, 622 N.E.2d 40, 43 (N.Y. 1988)).  The court must find "some

articulable nexus between the business transacted and the cause of action sued upon[.]"

Beacon Enterprises, 715 F.2d at 764.

Plaintiff offers the Affidavit of Melissa A. Waterhouse, AMBC's Chief Executive

Officer, in attempt to establish jurisdiction.  See Affidavit of Melissa A. Waterhouse

("Waterhouse Affidavit"), dkt. # 21-1.  Waterhouse relates that Todd Bailey started working

for ABMC in April, 2001 as Director of Business Development.  Id. at ¶ 7.  He was charged

with "all manner of sales and all manner of communications" with different agencies and

departments "throughout the United States."  Id. at ¶ 8.  Bailey became Vice President of

Sales and Marketing in January 2004.  Id. at ¶ 9.  Bailey entered in an agreement to keep

certain of Plaintiff's proprietary information confidential in 2004.  See Exh. A to

Waterhouse Affidavit, dkt. # 21-2.  He founded his own company, Premier Biotech, Inc., in

2009.  Waterhouse Affidavit at ¶ 11.  Waterhouse contends that the purpose of this

company was "to continue servicing a customer contract that, for regulatory reasons,

[Plaintiff] could no longer serve."  Id.  She alleges as well that beginning in September

2011, "Bailey transitioned into a 1099 consulting relationship with" Plaintiff.  Id. at ¶ 12.

Despite this new role, Waterhouse insists, Bailey's responsibilities at AMBC "remained

substantially the same."  Id. at ¶ 13.  Bailey retained his title as Vice President of Sales

and Marketing through November 2013.  Id.  He did not sign an agreement that

memorialized this new relationship, but he earned increased commissions "in lieu of his

previous salary."  Id. at ¶ 14.  Bailey remained a 1099 consultant until December 2016,

when Defendant "terminated" the relationship between the parties.  Id. ¶ 15.

11

Waterhouse's affidavit lists numerous alleged contacts with this forum.  According to Waterhouse, during the entire relationship between the two parties, "Bailey continuously reported to [Plaintiff's] Chief Executive Officer," who worked at the company's New York facility.  Id. at ¶ 16.  According to company organization charts, Bailey served as Acting Sales Manager, Acting Marketing Director, and National/Special Accounts Team Leader.  Id. at ¶ 17.  Many of Plaintiff's employees, "including employees located at ABMC's New York facility, reported directly to Bailey."  Id. at ¶ 18.  Among these employees were Plaintiff's National Sales Director, Director of International Sales, Director of Government Sales, Marketing-Account Specialist, Regional Sales Manager, International Sales Manager, Inside Sales and Marketing Manager, Product Manager, Sales Representative, Inside Sales Representative, and Assistant to the Vice President of Sales and Marketing.  Id. at ¶ 19.  Bailey traveled to New York for his initial interview in 2001.  Id. at ¶ 20.  He frequently attended sales meetings and customer meetings in New York, both before and after he began working as a consultant.  Id. at ¶ 21.  He "regularly" made presentations to the Board of Directors in New York.  Id. at ¶ 22.  Bailey "generally" made one or two trips per year as part of his work for Plaintiff, "[a]lthough not all such travel is documented."  Id. at ¶ 23.  Work led Bailey to travel to other states as well, including Maryland, Pennsylvania, and New Jersey, as well as to Washington, D.C.  Id. at ¶ 24.  Bailey spoke to Plaintiff's office by phone and email on a daily basis.  Id. at ¶ 25.  He was the company's highest-paid employee during much of his tenure, and his checks were issued by the Plaintiff's New York facility.  Id. at ¶ 26.

In support of their motion to dismiss, the Premier Defendants provide an affidavit from Todd Bailey.  See Affidavit of Todd Bailey ("Bailey Affidavit"), dkt. #15-2.  Bailey

asserts that at present, he lacks any "ongoing contracts in New York" and does not "have any contracts inside or outside New York to provide any services or goods in New York." Id. at ¶¶ 12-13.  Bailey does not "regularly solicit or engage in business or derive substantial revenue from goods used or consumed or services rendered in New York."  Id. at ¶ 15.  Bailey claims his employment with Plaintiff lasted from "approximately April 2001 to September 2011."  Id. at ¶ 16.  He served Plaintiff as a consultant from September 2011 until December 23, 2016, when Plaintiff terminated him.  Id. at ¶ 17.  Bailey resided in Minnesota during his relationship with Plaintiff and "conducted the majority of my business out of an office in Minnesota."  Id. at ¶ 18.  Bailey "did not negotiate or execute my Employee Compliance Certification or my 1099 consultant relationship with Plaintiff in New York."  Id. at ¶ 20.  He did not travel to New York to execute either agreement.  Id. at ¶ 21.  The 1099 consultant agreement did not contain a choice-of-law provision.  Id. at ¶ 23.

Plaintiff's Complaint as originally filed contains three causes of action against Defendant Todd Bailey, and those original claims are largely repeated in the proposed Amended Complaint.  The first alleges that Bailey violated the "Employee Compliance Certification" ("Certification") he signed with Plaintiff by using confidential and proprietary information obtained during his employment to advance the interests of Premier.  Complt. at ¶¶ 26-27.  Such conduct, Plaintiff insists, amounted to a breach of contract.  Id. at ¶ 29. The second cause of action alleges that Bailey violated a provision providing that Defendant Bailey  "may not directly or indirectly solicit suppliers, customers, employees, distributors, sub-distributors or consultants of the Plaintiff" for Bailey's own "benefit or the benefit of another party" for one year after the end of his employment.  Complaint at ¶ 34.

13

According to Plaintiff, Bailey's employment ended on December 23, 2016.  Id. at ¶ 35.  In February, 2017, Peckham informed the Plaintiff that its proposal to supply testing products to the Michigan Department of Corrections would use products supplied by Premier and Premier Labs, and not AMBC.  Id. at ¶ 36.  Plaintiff further alleges that Bailey "used his business relationship with Defendant Peckham," which he had developed during his employment with Plaintiff, to obtain this business from Peckham for Premier.  Id. at ¶ 37.  Such conduct, Plaintiff alleges, violated the Employee Compliance Certification.  Id. at ¶ 38.  The third claim alleges that Bailey misappropriated Plaintiff's trade secrets and used them to obtain contracts with the Michigan DOC.  Id. at ¶¶ 44-47.  The proposed supplement pleading, as explained below, adds Todd Bailey as a Defendant on claims initially raised only against the other Defendants.

The Court finds that Todd Bailey transacted business in New York within the meaning of Section 302(a)(1).  The factors related above support this finding.  See Sunward Electronics, 362 F.3d at 22.  As explained above, Bailey was Plaintiff's employee for a number of years.  The Employee Compliance Certification he signed in 2004 obligated him to keep certain proprietary information confidential, and this agreement stated that his "obligations related to the Information shall remain in effect until such time that the Information is no longer confidential or secret and is known to the general public." See Employee Compliance Certification, dkt. # 22-1, at 2.  Such "obligations . . . survive[d] any termination or resignation of my employment with" Plaintiff.  Id.  The parties do not deny the existence of this agreement.  On the face of this agreement, an ongoing contractual relationship existed between the parties.  While Bailey denies that he negotiated or executed this agreement in New York, he does not deny that, as part of the

14

employment that underlay that agreement, he traveled to New York at least once a year to make presentations to Plaintiff's Board of Directors, and he otherwise frequently traveled to New York for business purposes. Plaintiff thus "visited New York for the purpose of meeting with parties to the contract regarding the relationship." Id. The Certification contains a choice-of-law provision naming New York. See dkt. # 22-2 at ¶ 6. From the context of this agreement and the acknowledged employment relationship between Bailey and Plaintiff, the Court can also reasonably infer that the contract subjects Bailey to supervision by Plaintiff in the forum state. Thus, the totality of the circumstances indicates that Todd Bailey "purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws[.]" Bank Brussles Lambert, 171 F.3d at 787.

The Certification also provides the basis for the Court's conclusion that the cause of action alleging breach of the Certification "arises" from the business that Bailey transacted in New York.[1] As explained above, Plaintiff alleges that Bailey breached an agreement not to disclose proprietary information contained in the certification. Such an allegation provides "some articulable nexus between the business transacted and the cause of action sued upon," since a breach of the provisions contained in the contract provide the factual support for the claim. Beacon Enterprises, 715 F.2d at 764. The Court will deny the Premier Defendants' motion in this respect and find that Todd Bailey is subject to the

---

[1] Neither party provided the Court with a copy of any consulting agreement between the parties and the Court therefore has no basis to determine whether such an agreement–if one existed–would provide a basis to conclude that Bailey transacted business in New York or that he had an ongoing employment relationship with the Plaintiff. For that reason, the Court has focused on the terms of the Certification, which the parties have provided the Court.

Court's jurisdiction pursuant to NY CPLR 302(a)(1).

A final question remains. "If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010). "The Due Process clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014). The defendant need not be present in the state, but "the nonresident generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Due process requires that "the defendant's suit-related conduct . . . create a substantial connection to the forum State." Id. Such connection must be "with the forum State itself," and the court does not look to "the defendant's contacts with persons who reside there." Id. at 1122. In considering "whether personal jurisdiction is present, a court must consider a variety of interests," including "'the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice.'" Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County, 137 S.Ct. 1773, 1780 (2017) (quoting Kulko v. Superior Court of Cal., City and County of San Francisco, 436 U.S. 84, 92 (1978)). Still, the court's "'primary concern'" should be "'the burden on the defendant." Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, (1980)). Those burdens include both "the practical problems resulting from litigating in the forum" and "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." Id.

16

"For a state to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Waldman v. Palestine Liberation Organization, 835 F.3d 317, 335 (2d Cir. 2016) (quoting Walden, 134 S.Ct. at 1121). Due process requires that "the relationship" between the defendant and the forum State "must arise out of contacts that the 'defendant *himself*' creates with the forum state." Walden, 124 S.Ct. at 1222 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). The relevant connections are ones created by the defendant with the forum State, "'not the defendant's contacts with persons who reside there.'" Id. (quoting Walden, 134 S.Ct. at 1122).

The Court finds that Defendant Bailey's contacts with New York permit the Court to exercise personal jurisdiction over him without violating his Due Process rights. The basis for Section 302(a)(1) jurisdiction here is the contracts that Bailey entered into in New York. As explained above, those contracts envisioned a continuing relationship with New York. The Certification had a forum-selection clause that named New York. Both that contract and the employment agreements that Bailey signed "envisioned continuing and wide reaching contacts in the forum State." Id. (internal quotations ommitted). Similarly, Bailey's entry into New York for meetings and other activity related to his agreements with the Plaintiff also create contacts with the forum permitting the exercise of jurisdiction. See Id. ("[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State–either by the defendant in person or through an agent, goods, mail, or some other means–is certainly a relevant contact.") (internal citations ommitted)). The Court cannot see how allowing suit in New York against a former employee with a continuing contractual relationship to the Plaintiff offends traditional notions of fair play and justice.

17

Indeed, the Second Circuit Court of Appeals has noted that "despite the fact that Section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013). This is not one of those rare cases. The lawsuit grows out of Defendant Bailey's own contacts with the forum state, which were frequent and gave rise to the claims at issue. The motion will be denied in this respect.

**b.     April Bailey, Premier Biotech, Inc., and Premier Biotech Labs, LLC**

Defendants April Bailey, Premier Biotech, Inc., and Premier Biotech Labs, LLC also contend that the Court cannot exercise personal jurisdiction over them. They insist, like Todd Bailey, that they are not subject to general jurisdiction in the state. They also contend that they cannot be subject to specific jurisdiction because they do not conduct business in New York, have no ongoing contacts in New York, and do not contract to supply goods and services in New York. Plaintiff does not dispute that these defendants are not subject to general jurisdiction, nor does Plaintiff argue that these defendants transacted business in New York. Instead, Plaintiff claims that these Defendants are subject to jurisdiction because Todd Bailey acted as their agent in New York and they gave their knowledge and consent to that action.

The actions of an agent can subject a principal to personal jurisdiction in New York. CutCo Indus. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986). "In determining whether an agency exists under § 302, courts have focused on the realities of the relationship in

18

question rather than the formalities of agency law." Id.  An agent exists for these purposes when "the alleged agent . . . acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal.'" Id.  (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)).  If the parties have "joint control of a business enterprise–similar to that existing in a partnership or joint venture–enough control has been shown to establish *prima facie* this particular element of agency to satisfy long-arm jurisdiction." Id.

April Bailey submitted an affidavit in support of Defendants' motion.  See dkt. # 15-1 ("April Bailey Affidavit").  The affidavit relates that Bailey owns Premier Biotech, Inc., a company incorporated in Minnesota with its principal place of business in that state.  Id. at ¶ 2.  Bailey contends that she has no ownership interest or role in Premier Biotech Labs, LLC.  Id. at ¶ 3.  She has never visited New York for business, though she did vacation in the State in 2016.  Id. at ¶¶ 6-7.  She has not transacted business in New York, and has no ongoing contracts in the State, nor does she have any contracts to provide goods or services there.  Id. at ¶¶ 8-9.  Bailey also has not collected New York sales tax or shipped anything related to any contract into New York or entered the state in relation to a contract.  Id. at ¶ 10.  She does not regularly solicit business or engage in a persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in New York.  Id. at ¶ 11.

Todd Bailey's affidavit discusses the activities of Premier Labs and Premier Biotech, LLC.  See Bailey Affidavit, ¶¶ 2-11.  Bailey relates that he is President of both Premier Biotech, Inc., and Premier Biotech Labs, LLC.  Id. at ¶¶ 2-3.  Both companies are Minnesota companies with principal places of business in that State.  Id.  Premier Labs,

Bailey claims, has not transacted any business in New York and has no contract to provide any goods or services in New York. Id. at ¶ 6. Premier Labs has never registered to do business in New York, does not have any contracts with New York entities to supply goods there, has not collected sales taxes or shipped anything related to a contract into the State, and does not regularly solicit business or engage in any other persistent ocurse of contract in the state. Id. at ¶ 10. Premier Labs also does not derive any significant revenue from New York. Id. The company has no employees or offices in the State. Id. at ¶ 11.

Plaintiff responds to these claims in the affidavit of Melissa Waterhouse, dkt. # 21-1. Her affidavit alleges that Premier Biotech, Inc., is a "closely-held" Minnesota company owned by April Bailey, "and substantially controlled by Defendant Bailey."[2] Id. at ¶ 31. Likewise, Premier Biotech Labs, LLC, is a Minnesota company, "owned and managed by Defendant Bailey." Id. at ¶ 32. "Bailey and his business," Waterhouse claims, "perform services substantially similar to those provided by" Plaintiff. Id. at ¶ 33. Waterhouse claims that over several months, "beginning prior to" Bailey's termination by Plaintiff, "Bailey, by and through Premier and Premier Labs, has begun to solicit business of ABMC's customers." Id. at ¶ 34. Waterhouse also alleges that, in the State of Michigan, Bailey has, "by and through Premier and Premier Labs," used "non-public, proprietary information he obtained during the course of his work for ABMC to secure the Michigan DOC contract for himself." Id. at ¶ 56. Waterhouse also contends that Bailey used his knowledge of Plaintiff's methods to negotiate an agreement that benefitted Premier Labs

---

[2]The affidavit does not make clear to which Defendant Bailey this claim applies.

and Premier Biotech with the Northeastern Association for the Blind ("NABA") in Albany,

New York.  Id. at ¶¶ 62-68.  Waterhouse alleges that "defendants Todd Bailey and

Premier reached out to NABA in October, 2016, while Bailey was still under contract with

ABMC, seeking to contract with NABA as well."  Id. at ¶ 68.  NABA has begun to sell

Premier products in competition to Plaintiff's, and at a lower price.  Id. at ¶ 69.  These

actions, Waterhouse contends, "further demonstrate the significant nexus between Bailey,

his closely-held companies, and the State of New York."  Id. at ¶ 71.  He is also allegedly

using that information "to divert other customers . . . toward Premier and Premier Labs."

Id. at ¶ 62.

In its brief, Plaintiff argues that Todd Bailey transacted business in New York State

over a fifteen-year period, and in doing so became aware of confidential and proprietary

information and developed valuable business relationships with Plaintiff's customers,

distributors, and collaborators.  Bailey set up Premier, which April Bailey owns, in 2009

and Premier Labs in 2013, even as he continued to transact business in New York until

December 2016.  Since Bailey used the information he learned through his New York work

to benefit Premier and Premier Labs, he had transacted business in New York for the

other Premier Defendants' benefit.  Since Bailey had such a close relationship with April

Bailey and the Premier entities, Plaintiff argues, their knowledge and consent can be

inferred from his conduct.

Plaintiff's original Complaint did not contain any counts naming both Todd Bailey

and the other Premier Defendants.  In that sense, no cause of action could likely arise

from Bailey's alleged agency for the Premier Defendants.  Plaintiff proposed Amended

Complaint addressing this issue raises two causes of action against Premier, Premier

Labs, and April Bailey.  The fourth cause of action in that pleading alleges that Plaintiff

had an agreement with Defendant Peckham to cooperate in submitting a proposal to the

Michigan DOC to supply drug testing kits.  Proposed Amended Complt. at ¶ 67.  The

Premier Defendants were aware of this agreement, but they "persuaded or otherwise

incentivized Defendant Peckham to submit a proposal to supply DOC with drug testing kits

in cooperation with Premier and Premier Labs, rather than with the Plaintiff."  Id. at ¶¶ 68-

69.  That action caused Peckham to breach an agreement with Plaintiff.  Id. at ¶ 70.

Plaintiff contends that such conduct amounted to tortious interference with a contract.  Id.

at ¶ 71.  The fifth cause of action in the that proposed pleading alleges that Defendants'

conduct in that respect amounted to unjust enrichment.  Id. at ¶¶ 74-77.

Plaintiff does not show that a claim in the Complaint or the Proposed Amended

Complaint arises from Todd Bailey's activities in New York on behalf of Premier, which is

required for the Court to obtain long-arm jurisdiction over April Bailey and the two Premier

Companies.  While Waterhouse does allege that Todd Bailey negotiated an agreement

that violated his confidentially obligations with a New York company, that April Bailey and

the Premier Companies knew of that activity, and that these negotiations benefitted

Premier, that agreement–with NABA–does not form the basis of any of the counts in the

Complaint or the proposed supplemental pleading.  Plaintiff has alleged that Todd Bailey's

actions violated the confidentiality agreement he signed in 2006, but the parties' filings

also make clear that Todd Bailey did not negotiate that agreement on behalf of April Bailey

or the Premier Companies, nor with their knowledge or approval–April Bailey did not

control the companies, and they did not exist at the time Todd Bailey signed his

agreement.  He could not have transacted business as their agent at that time.  In

addition, the claims that concern April Bailey and the Premier Defendants arise out of

contract negotiations in Michigan, not in New York.  As explained with reference to

Peckham below, such contract negotiations cannot create Section 302(a)(1) jurisdiction in

New York.  The Court will therefore find that personal jurisdiction cannot be obtained with

respect to April Bailey, Premier, Inc., and Premier Labs, and grant their motion to dismiss

in that respect.

### c.    Defendant Peckham

Defendant Peckham Vocational Industries, Inc. ("Peckham") also seeks dismissal

due to a lack of personal jurisdiction.  As with the Premier Defendants, the parties focus

only on Section 302(a)(1) of New York's Civil Procedure Law and Rules.  The Court will

apply the standard articulated above.  Plaintiff argues that Peckham transacted business

in New York, and that this transaction of business gave rise to the claims against

Peckham.

Peckham submits the affidavit of Michael Stover, Business Development Manager

for the company, in support of its motion.  See dkt. # 16-1 ("Stover Affidavit").  Stover

relates that Peckham is a non-profit organization founded in 1976.  Id. at ¶ 3.  The

organization's purpose is "to provide job training and competitive employment

opportunities for persons with disabilities."  Id.  The organization seeks "to provide a wide

range of employment opportunities to those of our society who strive for independence

and self-sufficiency."  Id. at ¶ 4.  Peckham provides more than 30 programs for persons

with disabilities, "ranging from art to career planning, pre-employment screening to facility-

based training, youth programs to organizational employment and residential services."

Id. at ¶ 3.  These programs utilize a number of manufacturing plants, distribution centers

23

and call centers, located in the states of Michigan, Arizona and Iowa. Id. at ¶ 5. Peckham

does not operate any facilities in New York. Id. According to Stover, "Peckham conducts

no business whatsoever in New York." Id.

Stover further relates that Todd Bailey contacted Peckham on behalf of AMBC and

the Premier Defendants in April 2012. Id. at ¶ 6. Bailey related that AMBC had a contract

with the Michigan Department of Corrections ("MDOC") to supply the Department with

drug-testing kits. Id. MDOC had explained, however, that the Department hoped to award

future work to Michigan-based companies that employed people with disabilities. Id.

AMBC and Premier thus wanted to explore whether a Michigan company that employed

persons with disabilities, like Peckham, could work with them to supply MDOC's needs.

Id. At some later point, Peckham participated in a "trial run" pilot program to determine

whether Peckham could meet AMBC's needs for supplying the kits. Id. at ¶ 7. Stover

disputes AMBC's claim that Plaintiff approached Peckham about participating in the

program and instead asserts that he "believes" MDOC approached Peckham about taking

part in the test program. Id. at ¶ 7 n.1. Peckham participated successfully in this pilot

program, free of charge. Id. While AMBC continued to contract with MDOC to provide

testing kits from 2013 to 2017, Peckham "had no contract, agreement or involvement in

the manufacture or distribution of drug kits for, or on behalf of, AMBC at any point after

January 2013." Id. at ¶ 8. Peckham has recently submitted a bid to supply drug-testing

kits to MDOC. Id. at ¶ 9.

Stover avers that Peckham has not ever transacted any business in New York. Id.

at ¶ 11. Peckham has no office or any locations in New York, nor any employees in the

State. Id. Peckham has never manufactured goods there, and does not typically or

24

routinely receive goods shipped from New York.  Id. at ¶ 11.  Peckham has never

contracted with AMBC to provide goods or services in New York, and has no current, past

or ongoing business relationship with AMBC or any other New York entity.  Id. at ¶ 12.

The organization has never sold any products in New York or derived any revenue from

goods sold there.  Id. at ¶ 13.  While Peckham engaged in "intermittent telephone calls or

e-mails" with AMBC, no Peckham representative ever traveled to New York in connection

with the events giving rise to the lawsuit.  Id. at ¶ 14.  All in-person meetings occurred in

Peckham's Michigan offices.  Id.  Peckham simply received and distributed drug-testing

kits in its Lansing, Michigan distribution center over one week in January 2013, and then

sent them to MDOC locations within Michigan.  Id. at ¶ 15.

    Plaintiff responds to these allegations through the affidavit of Melissa Waterhouse.

See dkt. # 21-1.  Waterhouse relates that at some point MDOC informed AMBC that

"required goods and services" like the drug-testing kits AMBC supplied "would be acquired

. . . through a third party Community Rehabilitation Organization (CRO), which provides

employment [to] the disabled within the State of Michigan."  Id. at ¶ 37.  This

communication led AMBC to begin in late 2012 to "transition" towards "a state use

program using a third party CRO."  Id. at ¶ 38.  Plaintiff identified Peckham as a CRO

which could "employ individuals with disabilities to package [Plaintiff's] products and

supply them to" MDOC.  Id. at ¶ 39.  Whitehouse claims AMBC worked with Peckham for

four years "to take the actions necessary to transition the contract to state use."  Id. at ¶

40.  She further asserts that "[b]y organizing and supplying a trial run, or pilot, of

distribution of drug test kits to [MDOC] through Peckham," Plaintiff "'gave' Peckham the

experience they needed to prove to Michigan DOC that state use was appropriate for the

contract." Id. at ¶ 41.  AMBC shipped products from New York to Peckham, which

packaged the products and distributed them to MDOC "locations." Id. at ¶ 42.  While

Peckham was not paid for participating in this "trial run," AMBC covered all the shipping

costs. Id. at ¶ 43.  Whitehouse avers that "Peckham communicated regularly with"

Plaintiff's office in New York about "the trial run, and work instructions for the trial run were

prepared in New York. Id. at ¶ 44.  Whitehouse does not state who prepared those

instructions. Id.  Whitehouse also contends that Plaintiff "addressed and overcame legal

challenges when the fitness of the Michigan DOC contract for a state use program was

questioned." Id. at ¶ 45.

When Plaintiff in late 2016 learned that MDOC planned to issue a Request for

Proposal in a short period of time, Plaintiff contacted Peckham "to discuss the approach to

the" Request. Id. at ¶ 47.  Michigan issued the request on February 3, 2017, requiring

responses by March 3, 2017. Id. at 48.  Despite Plaintiff's long experience and

relationship with MDOC, Peckham informed Plaintiff on February 10, 2017 that the

organization would not work with Plaintiff to develop a proposal. Id. at ¶ 51.  Instead,

Peckham had agreed to partner with Premier. Id.  Peckham's decision came after Plaintiff

"had made significant expenditures toward gaining Peckham approval for state use" and

even though "Premier had no previous involvement in the process whatsoever." Id.  As a

result, Plaintiff was unable to prepare a proposal for MDOC that included a relationship

with a CRO, leaving AMBC "at a severe disadvantage[.]" Id. at 52.

Plaintiff admits that no contract actually existed between the AMBC and Peckham,

but argues that interaction between Peckham and Plaintiff about whether Peckham could

serve as a CRO for AMBC constitutes a transaction.  The Court is unpersuaded.  In this

respect, both sides agree that Peckham performed some distribution operations on a trial

basis for AMBC in Michigan, but such action was not performed pursuant to a contract

negotiated and executed in New York.[3]  Those actions could not constitute transacting

business in New York; they could best be characterized as actions preliminary to the

formation of a contract.[4]  See, e.g., C-Life Group v. Generra Co., 235 A.D.2d 267, 652

N.Y.S.2d 41 (1st Dept. 1997) ("The parties' initial, 45-minute meeting in New York was

clearly exploratory in nature, leading to nothing more than a proposal that was itself the

subject of further negotiations over the phone, by mail, and in meetings outside of New

York.  Such is not a transaction of business in New York within the meaning of CPLR

302(a)(1)"); International Customs Assocs. v. Ford Motor Co., 893 F.Supp. 1251, 1261

(S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-

domiciliary defendant who is outside New York, generally are insufficient to establish

personal jurisdiction").  Plaintiff does not deny that Peckham never conducted any actual

business in New York, never sold any products there, and never visited AMBC's offices in

the State.  While Plaintiff implies that an agreement existed between the AMBC and

Peckham by which Peckham would participate in Plaintiff's attempts to obtain a contract

with MDOC, the mere potential of a future agreement between the parties does not

_____

[3]Peckham points out that the organization had decades of experience in the operations tested and argues that a trial run was for AMBC's benefit.  Plaintiff sought to determine how AMBC could work with a CRO to distribute its products.

[4]Indeed, Whitehouse's affidavit makes clear that Plaintiff, at least, considered these tests as a dry run to make sure that Peckham could serve as a capable partner when it came time to submit a proposal to MDOC.  The activities surrounding these tests–which all occurred in Michigan anyway–could best be understood as preliminary explorations of the possibility of agreeing to a contract.  Whitehouse never explicitly states that the parties had an agreement together to seek a contract.

27

amount to transacting business within the meaning of New York's long-arm statute.  See Sun System Prefabricated Solar Greenhouses, Inc. v. Venuti, 596 F.Supp. 1516 (E.D.N.Y. 1984) (no transaction of business when parties discussed the terms of a contract in New York but produced no enforceable contractual agreement).

Even if the parties had created a contract, the facts as agreed to by the parties would not provide a basis for jurisdiction.  In Professional Personnel Mgmt. Corp. v. Southwest Medical Assocs., 216 A.D.2d 958 (4th Dept. 1995), the parties had "negotiated an agreement by telephone and subsequently entered into a written contract that was sent by plaintiff from New York to Nevada, where it was signed by defendant."  Id. at 958. Defendant later signed addenda to the contract, also in Nevada.  Id.  The physicians who were recruited under the terms of the contract all were recruited outside New York.  Id. Applying Section 302(a)(1), the court concluded that "Defendant's minimal contacts with New York are not sufficient to constitute the purposeful activity required for long-arm personal jurisdiction" in New York.  Id.  "Interstate negotiations by telephone, facsimile, or mail are insufficient to impose personal jurisdiction in New York upon a non-resident defendant."  Id.  Moreover, a "'plaintiff's own activities in New York, on behalf of defendant, cannot be relied on to establish the presence of the defendant in this State.'" Id. at 959 (quoting J.E.T. Adv. Assocs. v. Lawn King, 84 A.D.2d 744, 745 (2d Dept. 1981)).  The facts here are similar.  Nothing in the pleadings or the affidavits supplied by Plaintiff indicate any more than long-distance contact by Peckham with a New York company concerning an agreement jointly to seek a contract with a third party.   Nothing in that arrangement demonstrates that Peckham purposefully availed itself of the privilege of conducting activities in New York; Peckham did not transact any business in New York,

28

and CPLR 302(a)(1) provides no basis for long-arm jurisdiction.

For the reasons stated above, the Court will grant Peckham's motion to dismiss for lack of personal jurisdiction.

### B.    Other Motions

The Court's decision granting Defendants' motions in part and denying them in part creates difficulties concerning the proper adjudication of this matter.  Remaining before the Court are a number of other motions.  As a result of this decision, the case against Peckham, April Bailey, and the Premier Companies has been dismissed for want of jurisdiction.  Thus, the motions to dismiss as far as these Defendants go should not be decided by this Court.  Similarly, any attempt to amend the Complaint to supplement the claims against those Defendants would be moot.  The Court offers no opinion as to the viability of such claims.  If they were the only Defendants, the Court would simply dismiss the case, assuming that Plaintiff could re-file the action in another forum.  The Court has determined that personal jurisdiction exists over Todd Bailey, however.  Whether Plaintiff has stated a claim against Todd Bailey may still be a live controversy, but the viability of certain of those claims may bear some relation to the Court's ability to assert jurisdiction over those other Defendants. Similarly, the present situation may play some role in how the Court should adjudicate Plaintiff's cross-motion for a preliminary injunction.  Plaintiff's desire to prosecute such claims against Todd Bailey in this jurisdiction may also have been altered by the Court's inability to assert jurisdiction over the other Defendants.

In order to promote an efficient resolution of this matter, the Court will therefore deny that portion of Defendant Todd Bailey's motion which seeks to dismiss Plaintiff's action for failure to state a claim upon which relief could be granted with leave to renew.

29

Similarly, Plaintiff's cross-motion for a preliminary injunction will be denied with leave to renew. In addition, the dismissal of some parties to the Complaint may give rise to additional motions regarding the jusiticiability or proper forum of the case. Any remaining party seeking to file a renewed motion or any additional appropriate motion shall do so within 14 days of the date of this order.

## IV.    CONCLUSION

For the reasons stated above, the Premier Defendants' motion to dismiss, dkt. # 15, is hereby GRANTED in part and DENIED in part, as follows:

1.  The motion to dismiss for lack of personal jurisdiction of Defendants April Bailey, Premier Biotech, Inc., and Premier Labs, LLC, is hereby GRANTED. The Court declines to rule on those parties' motion to dismiss for failure to state a claim upon which relief could be granted. Those Defendants are hereby DISMISSED from the case;

2.  The motion to dismiss for lack of personal jurisdiction of Defendant Todd Bailey is hereby DENIED; and

3.  Todd Bailey's motion to dismiss for failure to state a claim upon which relief can be granted is hereby DENIED with leave to renew, as appropriate.

For the reasons stated above, Defendant Peckham's motion to dismiss, dkt. # 16, is hereby GRANTED on the basis of the Court's lack of personal jurisdiction over that Defendant. The Court declines to rule on Defendant Peckham's motion to dismiss for failure to state a claim upon which relief could be granted. Defendant Peckham is hereby DISMISSED from the case.

Plaintiffs' cross-motion for a preliminary injunction, dkt. # 21, is hereby DENIED

with leave to renew, if appropriate.  Plaintiff's motion to supplement the pleadings, dkt. # 25, is hereby DENIED with leave to renew.

Any renewed motion to dismiss, amend, for a preliminary injunction, or of another type that could divest the Court of authority to hear the case that the remaining parties desire to file shall be filed within 14 days of the date of this Order.

**IT IS SO ORDERED**

Dated: January 24, 2018

Thomas J. McAvoy
Senior, U.S. District Judge