## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BIO MEDICA CORPORATION, | |
| Plaintiff; | **Civil Action No.:**<br>**1:17-cv-00302-TJM-DJS** |
| -against- | |
| TODD BAILEY and PREMIER BIOTECH, INC., | **SUPPLEMENTAL/AMENDED**<br>**COMPLAINT** |
| Defendants. | |

Plaintiff, AMERICAN BIO MEDICA CORPORATION, by and through its attorney, as and for a Verified Complaint, state the following:

1.  At all times herein mentioned, Plaintiff AMERICAN BIO MEDICA CORPORATION (hereinafter "ABMC") is and was a Domestic Business Corporation with a principal place of business situate in the Town of Stuyvesant, County of Columbia, State of New York, more particularly known as 122 Smith Road, in the Town of Stuyvesant, County of Columbia, State of New York.

2.  At all times herein mentioned, ABMC was and is engaged in the business of developing, manufacturing, and marketing accurate, cost-effective immunoassay test kits and point of collection tests for drugs of abuse (hereinafter "drug testing kits").

3.  Upon information and belief, Defendant Todd Bailey (hereinafter "Bailey") is a natural person whose address is in the City of Shorewood, in the County of Hennepin, State of Minnesota, more particularly known as 28115 Boulder Bridge Drive, Shorewood, Minnesota 55331.

4. Upon information and belief, Defendant Premier Biotech, Inc., (hereinafter "Premier") is a Domestic Business Corporation with a Principal Executive Office situate in the City of Chanhassen, Counties of Carver and Hennepin, State of Minnesota, more particularly known as 6630 Lakeway Drive, Chanhassen, Minnesota 55317. Defendant Bailey is the president of Premier and a shareholder thereof. Since its inception, Premier has been in the business of providing products and services not dissimilar from those provided by the Plaintiff. See Exhibit A.

**INTRODUCTION**

5. Beginning in or about April of 2001 and ending on or about December 23, 2016, Defendant Bailey was an employee and/or consultant of the Plaintiff. Defendant Bailey served the Plaintiff in various capacities, including but not limited to Vice President of Sales and Marketing. A copy of Defendant Bailey's Employee Compliance Certification—a signed, written agreement delineating, among other things Defendant Bailey's duties and obligations to the Plaintiff—is attached hereto as Exhibit B.

6. Defendant Bailey's position with the Plaintiff was a senior management position, by which he earned in excess of $200,000.00 per year, and by which he had significant contact with the Plaintiff's customers and sales staff—both in-house and otherwise—and had access to proprietary and confidential information regarding the Plaintiff's contracts, pricing, product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the Plaintiff's industry.

7. Defendant Bailey represented the Plaintiff in business matters throughout the United States and Europe and regularly attended trade shows on behalf of the Plaintiff and at

the Plaintiff's expense.

8.   In 2009, with the Plaintiff's knowledge and consent, Bailey founded his own company, defendant Premier, in order to continue servicing a customer contract that, for regulatory reasons, the Plaintiff could no longer service.

9.   In September, 2011, Bailey transitioned into a 1099 consulting relationship with the Plaintiff, whereby Bailey received an increased commission on sales in lieu of his previous salary.

10.  No written agreement memorialized Bailey's transition; Bailey's responsibilities with the Plaintiff, and the levels of information he received related to the Plaintiff and its business, remained substantially the same; and Bailey retained the title of Vice President of Sales and Marketing through November, 2013.

### Arkansas Department of Health and Human Services

11.  Prior to 2016, the Plaintiff had a longstanding account with the Arkansas Department of Health and Human Services (hereinafter "ARDHHS") for "Point of Care" drug testing.

12.  Defendant Bailey was not the specific sales representative for the ARDHHS account, but he sat in on client meetings in New York and was aware of the contract's details through his position with the Plaintiff.

13.  ARDHHS had a separate contract with an industry competitor, Alere, for "Lab Service" drug testing.

14.  ARDHHS had difficulties with Alere's "Lab Services," and the Plaintiff recommended that it instead contract with Premier, a company owned and controlled by Bailey, for its "Lab Service" drug testing needs.

15. Premier was awarded the ARDHHS "Lab Services" contract because of the Plaintiff's introduction and recommendation.

16. In July of 2016, the Plaintiff was notified Premier was quoting the ARDHHS prices for "Point of Care" drug testing that matched the Plaintiff's pricing.

17. When the Plaintiff's representatives confronted Bailey about Premier's activities with regard to the ARDHHS, Bailey repeatedly stated to the Plaintiff that Premier would stop marketing "Point of Care" tests to the ARDHHS.

18. Shortly thereafter, however, the Plaintiff's main contact at the ARDHHS, who had previously been involved in all meetings related to the ARDHHS "Point of Care" drug testing program, began to be excluded from those meetings.

19. In December of 2016, the Plaintiff learned that Premier had been awarded the ARDHHS contract for "Point of Care" Drug testing—typically worth more than $200,000.00 in gross annual revenue for the Plaintiff—effective January 1, 2017.

20. The Plaintiff subsequently learned that ARDHHS and Premier had entered into a six-month pilot program for "Point of Care" drug testing, during which time ABMC had still been servicing the ARDHHS contract.

21. It was Todd Bailey and Premier undermining the Plaintiff's contract with ARDHHS that led the Plaintiff to terminate its relationship with Todd Bailey on December 23, 2016.

### Department of Corrections of the State of Michigan

22. The Plaintiff also had a contractual relationship with the Department of Corrections of the State of Michigan (hereinafter "DOC"), wherein the Plaintiff has supplied DOC

with drug testing kits for a period of longer than fourteen (14) years. The Plaintiff's contract with DOC routinely generated between $800,000.00 and $1,000,000.00 in gross yearly revenue for the Plaintiff.

23. Defendant Bailey, while employed with and consulting for the Plaintiff, was responsible for managing the Plaintiff's contract with DOC.

24. In 2012, the Plaintiff was informed by DOC that, according to state regulations, DOC would be required to publicly request proposals for future contracts, rather than simply renewing its contract with the Plaintiff. Such a Request for Proposals would not be necessary, however, if the Plaintiff supplied its products through a Community Rehabilitation Organization (hereinafter "CRO"), provided that such CRO was proved to be a "worthy supplier"—that is, that it had prior experience, in quality, function, and quantity, providing the contract service—thus meeting the standards required by the State of Michigan.

25. Beginning in 2012, the Plaintiff developed a business relationship with Peckham, a CRO in the State of Michigan, with the intention that Peckham would package products supplied by the Plaintiff and then distribute them to DOC.

26. Defendant Bailey, as the individual responsible for managing the Plaintiff's contract with DOC, also served as the Plaintiff's primary contact with Peckham.

27. Upon information and belief, Defendant Bailey informed Peckham at that time— unbeknownst to the Plaintiff—that he was contacting Peckham on behalf of both the Plaintiff and Defendant Premier.

28. Over a period of approximately five (5) years, the Plaintiff expended significant funds,

resources, and energy to ensure that Peckham was suitably prepared to package the

Plaintiff's products and distribute them to DOC, and through the Plaintiff's

expenditures, Peckham was eventually proved to be a "worthy supplier," meeting the

standards required by the State of Michigan. The Plaintiff's contract with DOC was

extended by exception throughout this period.

29. In 2016, the Plaintiff was informed that, rather than contracting with Peckham, which

    would in turn supply the Plaintiff's products, DOC would instead be requesting

    proposals from CROs to supply drug testing kits to DOC.

30. On December 23, 2016, the Plaintiff terminated its consulting relationship with

    Defendant Bailey and transferred management of the DOC contract to in-house staff.

31. In January of 2017, in anticipation of the approaching Request for Proposal from DOC,

    the Plaintiff contacted Peckham so that Peckham could work with the Plaintiff in

    preparing a proposal to DOC. At no point during multiple conversations with Peckham

    during January of 2017 did Peckham indicate to the Plaintiff that Peckham did not

    intend to continue its business relationship with the Plaintiff.

32. The anticipated Request for Proposals was issued by DOC on February 3, 2017,

    requiring responses by March 3, 2017.

33. On February 10, 2017, Peckham informed the Plaintiff that in its response to DOC's

    Request for Proposals, it would propose to package and distribute products supplied by

    Defendant Premier, rather than by the Plaintiff.

34. After being informed that Peckham would submit a proposal to supply Premier's products, rather than the Plaintiff's products, to DOC, the Plaintiff searched for another CRO through which to submit a proposal to DOC.

35. On short notice, however, the Plaintiff was unable to identify another CRO that could coordinate with the Plaintiff to meet the requirements of the DOC contract.

36. Instead, although priority would be given to proposals placed by CROs, the Plaintiff submitted a proposal to supply products to DOC without the benefit of a CRO distributor.

37. Peckham, as advised, submitted a proposal for the DOC contract in conjunction with Premier and Todd Bailey.

38. In its proposal, Peckham relied specifically upon its experience in the 2013 pilot program organized and funded by the Plaintiff. See Exhibit C, Question 7.

39. In its proposal, Peckham relied specifically upon Todd Bailey's familiarity with DOC's staff and personnel, which was established over a period of years at the Plaintiff's expense. See Exhibit C, Question 8.

40. In its proposal, Peckham relied upon its five-year relationship with Defendant Premier, but the relationship between Peckham and Todd Bailey was established and built at the expense, and for the benefit, of the Plaintiff, rather than Premier. See Exhibit D, Section 3.6.

41. In its proposal, Peckham relied upon Premier's prior experience servicing the Arkansas Department of Human Services (hereinafter "AR DHS"), but Todd Bailey participated in managing AR DHS accounts on behalf of the Plaintiff as well as Premier, and the

events characterized in Peckham's proposal precipitated the termination of Todd Bailey's business relationship with the Plaintiff. See <u>Exhibit D</u>, Section 3.6.

42. In its proposal, Peckham appended a copy of Premier's product recall procedure, but that document is materially identical to the Plaintiff's own product recall procedures, which were internal quality control materials disseminated to Todd Bailey in the course of his employment with the Plaintiff. See <u>Exhibit D</u>, Section 1.5 and internal exb. I.

43. In July of 2017, the Michigan Department of Technology, Management & Budget (hereinafter "DTMB"), which oversees bidding on state contracts in the State of Michigan, announced its recommendation that the DOC contract be awarded to Peckham—and by extension, to Todd Bailey and Premier.

44. On July 14, 2017, the Plaintiff submitted a letter of protest of the award recommendation to Peckham, but the Plaintiff's protest was denied in a July 26, 2017 correspondence from DTMB. See <u>Exhibit E</u>.

45. The contract award was approved by the Michigan State Administrative Board on August 15, 2017 and became effective September 1, 2017, see <u>Exhibit F</u>.

46. The official estimated value of the DOC contract is $1,872,309.00 over a period of three (3) years, but as that value accounts for only "standard" products being ordered by DOC, which is unlikely, it is anticipated that the actual value of the contract will be substantially higher.

<u>Northeast Association of the Blind at Albany</u>

47. The Plaintiff also has a contractual agreement with the Northeastern Association for the Blind at Albany (hereinafter "NABA")—a New York not-for-profit corporation located

in Albany, New York that provides services for individuals with vision impairments—whereby NABA packages and distributes the Plaintiff's products, which are then eligible to be sold through the New York State Preferred Source Program for People who are Blind (hereinafter "NYSPSP"), from which state and local agencies are required to purchase goods and services.

48. The products of Plaintiff that NABA sells, and the prices at which NABA sells them, are public information, but the prices at which the Plaintiff sells to NABA, and NABA's price mark-up, are confidential and proprietary.

49. Todd Bailey had access to the Plaintiff's confidential pricing information in the course of his work with the Plaintiff and attended meetings with NABA on the Plaintiff's behalf.

50. Since Bailey's termination, the Plaintiff has become aware that in October, 2016 (when he was still employed by the Plaintiff and shortly after attending meetings with NABA on the Plaintiff's behalf), Bailey (as a representative of Premier), contacted NABA to establish a contract with NABA to sell Premier products through NYSPSP.

51. The Premier products being sold to NABA are substantially similar to the ABMC products sold through NABA and NYSPSP, but Premier has undercut the Plaintiff's pricing using confidential ABMC pricing information.

<u>U.S. Department of Defense</u>

52. Further, during Bailey's tenure with the Plaintiff, he attended various meetings for the purpose of establishing a business relationship between the Plaintiff and the U.S. Department of Defense, to whom the Plaintiff hoped to sell drug testing equipment.

53. The plaintiff paid all travel expenses for Bailey's meetings with the Department of Defense and also paid for a consultant to attend those meetings with Bailey.

54. The Plaintiff never developed a business relationship with the Department of Defense nor saw any business from Bailey's activities.

55. However, the Plaintiff subsequently learned that, after Bailey's termination, Premier secured a contract with the Department of Defense.

56. The Plaintiff also subsequently learned that Bailey, in an attempt to secure more government business, continued to contact the Plaintiff's consultant—without informing the consultant that he, Bailey, no longer represented the Plaintiff.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT BAILEY

57. The Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "56" as if more fully set forth herein.

58. The first section of Defendant Bailey's Employee Compliance Certification states that Defendant may not use any confidential or proprietary information he acquires in the course of his employment with the Plaintiff for any purpose other than to perform his duties as an employee of the Plaintiff.

59. The first section of Defendant Bailey's Employee Compliance Certification states that proprietary information includes (among other information) business plans and strategies, financial information and forecasts, marketing strategies and information, information regarding customers and their specialized requirements, and information regarding customer contracts.

60. Defendant Bailey used confidential information acquired during his employment with

the Plaintiff—in particular, information regarding the specialized requirements of the Plaintiff's relationship with DOC, such as the need for the involvement of a CRO, Peckham's availability and experience in performing that specialized service, and Peckham's financial arrangements with the Plaintiff—to advance the interests of Defendant Premier.

61. Defendant Bailey's use of the Plaintiff's proprietary information for such purpose—a purpose other than performance of his duties for the Plaintiff—represents a breach of of his Employee Compliance Certification.

62. Because Defendant Bailey has breached his Employee Compliance Certification, the Plaintiff stands at risk of losing one of its largest customers, to which a significant portion of the Plaintiff's overall revenue has been attributable for a period of approximately fourteen (14) years.

63. Given the significance of the contract, the loss of DOC as a customer would represent an irreparable harm to the Plaintiff.

64. The Plaintiff is entitled to have its proprietary information protected from Defendant Bailey's use in breach of the Employee Compliance Certification.

65. To prevent irreparable harm as a result of the breach by Defendant Bailey, the Plaintiff is entitled to a permanent injunction, as well as a preliminary injunction and temporary restraining order pending the outcome of a hearing before the court.

66. In the alternative, the Plaintiff has suffered damages in excess of $1,872,309.00, the estimated value of the the DOC contract.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT BAILEY

67. The Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "66" as if more fully set forth herein.

68. The first section of Defendant Bailey's Employee Compliance Certification states that Defendant may not use any confidential or proprietary information he acquires in the course of his employment with the Plaintiff for any purpose other than to perform his duties as an employee of the Plaintiff.

69. The first section of Defendant Bailey's Employee Compliance Certification states that proprietary information includes (among other information) business plans and strategies, financial information and forecasts, marketing strategies and information, information regarding customers and their specialized requirements, and information regarding customer contracts.

70. Defendant Bailey used confidential information acquired during his employment with the Plaintiff—in particular, information regarding the Plaintiff's sales strategies, profit margins, and pricing on the NABA contract, and NABA's price mark-up—to advance the interests of Defendant Premier, enabling Premier to undercut the defendants prices through its own contract with NABA.

71. Defendant Bailey's use of the Plaintiff's proprietary information for such purpose—a purpose other than performance of his duties for the Plaintiff—represents a breach of of his Employee Compliance Certification.

72. Because Defendant Bailey has breached his Employee Compliance Certification, the Plaintiff has been damaged through lost revenues in an amount yet to be determined.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT BAILEY

73. The Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "72" as if more fully set forth herein.

74. The second section of Defendant Bailey's Employee Compliance Certification states that Defendant Bailey may not directly or indirectly solicit suppliers, customers, employees, distributors, sub-distributors or consultants of the Plaintiff for Defendant Bailey's own benefit or the benefit of another party for a period of one (1) year following the end of his employment.

75. Defendant Bailey's affiliation with the Plaintiff was terminated on December 23, 2016.

76. On February 10, 2017, the Peckham informed the Plaintiff that its proposal to DOC would call for the packaging and distribution of products supplied by Defendant Premier, rather than products supplied by the Plaintiff.

77. Defendant Bailey used his business relationship with Peckham, which he had developed in the course of his employment with the Plaintiff, to persuade Peckham to use the products of Defendant Premier, rather than those of the Plaintiff, in the context of Peckham's proposal to DOC.

78. Defendant Bailey's conduct constitutes solicitation of a customer (DOC) and of a distributor (Peckham) within one (1) year of the end of his employment with the Plaintiff, placing Defendant Bailey in breach of his Employee Compliance Certification.

79. Because Defendant Bailey has breached his Employee Compliance Certification, the Plaintiff stands at risk of losing one of its largest customers, to which a significant

portion of the Plaintiff's overall revenue has been attributable for a period of approximately fourteen (14) years.

80. Given the significance of the contract, the loss of DOC as a customer would represent an irreparable harm to the Plaintiff.

81. The Plaintiff is entitled to have its customer relationships with DOC and other clients—as well as its distribution relationship with Peckham—protected from solicitation by Defendant Bailey in breach of the Employee Compliance Certification.

82. To prevent irreparable harm as a result of the breach by Defendant Bailey, the Plaintiff is entitled to a permanent injunction, as well as a preliminary injunction and temporary restraining order pending the outcome of a hearing before the court.

83. In the alternative, the Plaintiff has suffered damages in excess of $1,872,309.00, the estimated value of the the DOC contract.

**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT BAILEY**

84. The Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "83" as if more fully set forth herein.

85. The second section of Defendant Bailey's Employee Compliance Certification states that Defendant Bailey may not directly or indirectly solicit suppliers, customers, employees, distributors, sub-distributors or consultants of the Plaintiff for Defendant Bailey's own benefit or the benefit of another party during his employment.

86. During 2016, Defendant Bailey engaged in a course of conduct with ARDHHS, a customer of the Plaintiff at that time, directed toward undermining the Plaintiff's contract with ARDHHS and procuring a contract with ARDHHS for Defendant

Premier.

87. Defendant Bailey's conduct constitutes solicitation of a customer (ARDHHS) during his employment with the Plaintiff, placing Defendant Bailey in breach of his Employee Compliance Certification.

88. As a direct result of Defendant Bailey's conduct, ARDHHS discontinued its contract with the Plaintiff and now purchases drug testing kits from Defendant Premier.

89. Because Defendant Bailey has breached his Employee Compliance Certification, the Plaintiff has lost a significant customer in ARDHHS, and has been damaged in a sum in excess of $200,000.00, the approximate annual value of the Plaintiff's contract with ARDHHS.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT BAILEY

90. Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "89" as if more fully set forth herein.

91. During the course of his employment with the Plaintiff, Defendant Bailey had access to proprietary and confidential information regarding the Plaintiff's contracts, pricing, product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the Plaintiff's industry.

92. Such information, gathered through significant time, effort, and cost, permits the Plaintiff to gain an advantage over competitors within the Plaintiff's industry who do not have access to the same.

93. Defendant Bailey used such information, in particular the status of the Plaintiff's contract with DOC, the involvement of Peckham in the continuance of that contract,

and the Plaintiff's internal costs and profit margins with regard to that contract, to advance the interests of Defendant Premier in competing with the Plaintiff to secure the DOC contract.

94. In so using the Plaintiff's proprietary and confidential information, Defendant Bailey misappropriated the Plaintiff's trade secrets.

95. Because Defendant Bailey has misappropriated the Plaintiff's trade secrets, the Plaintiff stands at risk of losing one of its largest customers, to which a significant portion of the Plaintiff's overall revenue has been attributable for a period of approximately fourteen (14) years.

96. Given the significance of the contract, the loss of DOC as a customer would represent an irreparable harm to the Plaintiff.

97. The Plaintiff is entitled to have its trade secrets protected from misappropriation by Defendant Bailey.

98. To prevent irreparable harm as a result of the misappropriation by Defendant Bailey, the Plaintiff is entitled to injunctive relief.

99. In the alternative, the Plaintiff has suffered damages in excess of $1,872,309.00, the estimated value of the the DOC contract.

**AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT BAILEY**

100. Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "99" as if more fully set forth herein.

101. During the course of his employment with the Plaintiff, Defendant Bailey had access to proprietary and confidential information regarding the Plaintiff's contracts, pricing,

product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the Plaintiff's industry.

102. Such information, gathered through significant time, effort, and cost, permits the Plaintiff to gain an advantage over competitors within the Plaintiff's industry who do not have access to the same.

103. Defendant Bailey used such information—in particular, information regarding the Plaintiff's sales strategies, profit margins, and pricing on the NABA contract, and NABA's price mark-up—to advance the interests of Defendant Premier in competing with the Plaintiff.

104. In so using the Plaintiff's proprietary and confidential information, Defendant Bailey misappropriated the Plaintiff's trade secrets.

105. Because Defendant Bailey has misappropriated the Plaintiff's trade secrets, the Plaintiff has been damaged through lost revenues in an amount yet to be determined.

**AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANT TODD BAILEY**

106. Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "105" as if more fully set forth herein.

107. As and employee and/or consultant, Defendant Bailey owed the Plaintiff a duty of loyalty with regard to the Plaintiff's existing and prospective customers.

108. Defendant Bailey met with the U.S. Department of Defense, on multiple occasions, at the Plaintiff's expense and putatively on the Plaintiff's behalf, for the purpose of securing a contract between the Department of Defense and the Plaintiff.

109. Defendant Bailey failed to secure a contract between the Department of Defense and

the Plaintiff, but shortly after his termination, he successfully secured a contract between the Department of Defense and his own company, Premier.

110. Defendant Bailey neglected to use the knowledge, relationships, and resources he secured for the benefit of the Plaintiff, and instead used them for his own benefit and for the benefit of Premier.

111. In so doing, Defendant Bailey diverted a corporate opportunity of the Plaintiff, causing damage to the plaintiff in an amount yet to be determined.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANT TODD BAILEY, AND A FIRST CAUSE OF ACTION AGAINST DEFENDANT PREMIER

112. Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "111" as if more fully set forth herein.

113. The Plaintiff had an agreement with Peckham to cooperate in submitting a proposal to supply DOC with drug testing kits.

114. Upon information and belief, Defendants Todd Bailey and Premier were aware of the agreement between the Plaintiff and Peckham.

115. Upon information and belief, Defendants Todd Bailey and Premier have persuaded or otherwise incentivized Peckham to submit a proposal to supply DOC with drug testing kits in cooperation with Premier, rather than with the Plaintiff.

116. In so persuading or incentivizing Peckham, Defendants Todd Bailey, and Premier caused Peckham to breach its agreement with the Plaintiff.

117. In so acting, Defendants Todd Bailey, and Premier have tortiously interfered with a contract.

118. As a result of the Defendants' interference, the Plaintiff has suffered damages in excess

of $1,872,309.00, the estimated value of the the DOC contract.

### AS AND FOR A NINTH CAUSE OF ACTION AGAINST DEFENDANT TODD BAILEY, A SECOND CAUSE OF ACTION AGAINST DEFENDANT

119. Plaintiff repeats, restates, and realleges each and every allegation set forth in the paragraphs numbered "1" through "118" as if more fully set forth herein.

120. The cooperation of Defendants Todd Bailey and Premier with Peckham in submitting a proposal to supply drug test kits to DOC, to the exclusion of the Plaintiff, has caused those parties to be awarded a contract worth in excess of $1,872,309.00, and the Plaintiff to be denied the same.

121. The Plaintiff made significant investments of time, effort, and money over a period of years to ensure that Peckham was suitably prepared to package and distribute products to DOC as required under the contract, and the Plaintiff's investments were the primary cause behind Peckham proving itself to be a "worthy supplier."

122. Equity and good conscience dictate that Defendants Todd Bailey and Premier should not be permitted to retain the significant gains of the contract award, as those gains have been realized at the Plaintiff's expense.

123. As such, Defendants Todd Bailey and Premier have been unjustly enriched, and the value of the gains they have realized should rightfully be remitted to the Plaintiff.

**WHEREFORE,** Plaintiff American Bio Medica Corporation humbly prays this Honorable Court grant judgement as follows:

a. One the first, third, and fifth causes of action:

    i. In favor of Plaintiff American Bio Medica Corporation for a permanent injunction against Defendant Todd Bailey; or, in the alternative;

    ii. In favor of Plaintiff American Bio Medica Corporation for damages against Defendant Todd Bailey;

b. In favor of Plaintiff American Bio Medica Corporation for damages against Defendant Todd Bailey on the second, fourth, sixth, and seventh causes of action;

c. In favor of Plaintiff American Bio Medica Corporation for damages against Defendants Todd Bailey and Premier Biotech, Inc. for the eighth cause of action against Bailey and the first cause of action against Premier;

d. In favor of Plaintiff American Bio Medica Corporation for any and all inequitably realized gains against Defendants Todd Bailey and Premier Biotech, Inc.for the ninth cause of action against Bailey and the second cause of action against Premier;

e. For all such other and further relief as to this Honorable Court shall deem just, proper, and equitable.


Dated:                                                    WILLIAM J. BETTER, P.C.


                                                   _____

William J. Better, Esq. (508431)
1 Albany Avenue
Kinderhook, NY 12106
(518) 758-1511
williamjbetter@williamjbetterpc.com