**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AMERICAN BIO MEDICA CORPORATION

               Plaintiff,

    v.                                   1:17-cv-302
                                       (TJM/DJS)

TODD BAILEY, and PREMIER BIOTECH,
INC.,

               Defendants.

_____

**Thomas J. McAvoy, Sr. U.S.D.J.**


## DECISION & ORDER

Before the Court are Defendant Todd Bailey's motion to dismiss and Plaintiff

American Bio Medica Corporation's ("AMBC") motion for reconsideration and for leave to

supplement the complaint.  <u>See</u> dkt. #s 38-39.

## I.    BACKGROUND

Plaintiff filed the instant action in the Supreme Court of Columbia County, New York

on or about February 27, 2017.  <u>See</u> Notice of Removal, dkt. # 1, at ¶ 2.  Then-

Defendants Todd Baily, April Bailey, Premier Biotech Inc., and Premier Biotech Labs, LLC

("the Premier Defendants") filed a notice of removal in this Court on March 16, 2017,

contending that diversity jurisdiction existed because the Defendants and Plaintiff were

from different states and the amount in controversy exceeded $75,000.  <u>Id.</u> at ¶ 4.  After

the Premiere Defendants removed the case to this Court, they filed a motion to dismiss.

See dkt. # 15.  The remaining Defendant, Peckham Vocational Industries, Inc.

("Peckham"), also filed a motion to dismiss.  See Dkt. # 16.   Plaintiff also filed a cross-

motion for a preliminary injunction, dtk. #21, and a motion for leave to supplement the

pleadings, dkt. # 25.

The Court considered the motions to dismiss and granted those motions except for

that of Todd Bailey on the basis that the Court lacked personal jurisdiction over the other

defendants.  See dkt. # 35.  The Court also denied Todd Bailey's motion to dismiss with

leave to renew.  Id.  Finally, the Court denied Plaintiff's motion for a preliminary injunction

and for leave to supplement with leave to renew.  Id.

Plaintiff then filed the instant motion for reconsideration and for leave to supplement

and Defendant Todd Bailey filed the instant motion to dismiss.  Those motions have been

briefed and are presently before the Court.

## II.    LEGAL STANDARDS

### A.    Reconsideration

Plaintiff seeks reconsideration of the Court's order dismissing the case against

Defendant Premier Biotech, Inc.  When a party files a motion for reconsideration, "[t]he

standard for granting such a motion is strict, and reconsideration will generally be denied

unless the moving party can point to controlling decisions or data that the court

overlooked–matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court."  Shrader v. CSX Transp., 70 F.3d 255, 257 (2d Cir.

1995).  Such a motion is "not a vehicle for relitigating old issues, presenting the case

under new theories, securing a rehearing on the merits, or otherwise taking 'a second bite

at the apple[.]'" <u>Analytical Surveys, Inc. v. Tonga Partners, L.P.</u>, 684 F.3d 36, 41 (2d Cir. 2012) (quoting <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d 136, 144 (2d Cir. 1998)).

## B.    Motion to Supplement

Plaintiff also moves for leave to supplement the pleading.  Federal Rule of Civil Procedure 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction occurrence, or event that happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d).  A supplemental pleading may be allowed "even though the original pleading is defective in stating a claim."  <u>Id.</u>  "An application for leave to file a supplemental pleading is addressed to the discretion of the court, and permission should be freely granted where such supplementation will promote economic and speedy disposition of the controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of either party."  <u>Bornholdt v. Brady</u>, 869 F.2d 57, 68 (2d Cir. 1989).  As such, "leave to file a supplemental pleading should be freely granted when the supplemental facts connect it to the original pleading" <u>Quarantino v. Tiffany & Co.</u>, 71 F.3d 58, 66 (2d Cir. 1995).  A court will normally permit such pleading, "especially when the opposing party is not prejudiced by" it.  <u>Id.</u>  Still, courts can use their discretion to deny supplemental pleading because of "undue delay, bad faith, dilatory tactics, undue prejudice . . . , or futility[.]"  <u>Id.</u>  Futility occurs when "the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  <u>Lucente v. IBM</u>, 310 F.3d 243, 258 (2d Cir. 2002).  That standard is recited below.

## C.    Motion to Dismiss

Defendant Todd Bailey has filed a motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant argues that Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true. In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.  ANALYSIS

### A.  Reconsideration

The Court will first address Plaintiff's motion for reconsideration. Plaintiff argues for reconsideration on only one ground: that Defendant Premiere Biotech, Inc., had actually consented to jurisdiction. Defendants do not address this issue in responding to Plaintiff's brief, and the Court assumes they do not oppose such a finding. The Court agrees that dismissing the case against Premier Biotech, Inc. was in error, and the Court will grant the motion in that respect.

### B.  Motion to Supplement

Plaintiff next renews its motion to supplement the pleadings with information allegedly newly obtained about Defendant Todd Bailey's conduct. Plaintiff also seeks, in

its renewed motion, to amend the Complaint to add causes of action against Defendant Todd Bailey and Premier Biotech and remove all claims against the other original Defendants. Defendant responds by arguing that any supplementation would be futile. Defendant does not argue any other basis for denying the motion.[1]

Plaintiff seeks to supplement the Complaint in a number of ways, which Defendant opposes as futile. The Court will address them in turn.

### i. Proposed Amended/Supplemental Pleading

Plaintiff has submitted a proposed supplemental pleading, which the Court will summarize here. See Supplemental/Amended Complaint ("Supp. Complt."), dkt. # 39-3.

The proposed complaint names two Defendants, Todd Bailey and Premier Biotech, Inc. Id. at ¶¶ 3-4. Plaintiff alleges that Defendant Todd Bailey was an employee and/or consultant for Plaintiff from April 2001 to December 23, 2016. Id. at ¶ 5. He had various positions, including Vice President of Sales and Marketing. Id. Plaintiff's job respresented a "senior management position," and he earned more than $200,000 a year. Id. at ¶ 6. Plaintiff also "had significant contact with Plaintiff's customers and sales staff," as well as "access to proprietary and confidential information" about "Plaintiff's contracts, pricing, product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the industry." Id. Bailey also represented Plaintiff at various conferences and functions around the world, at Plaintiff's expense. Id. at ¶ 7.

---

[1]Based on Defendant's briefing, the Court would apply the same standard of futility to evaluating an Amended Complaint as to the motion to supplement. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party.")(quoting Forman v. Davis, 371 U.S. 178, 182 (1962)).

Bailey founded his own company in 2009 without Plaintiff's consent.  Id. at ¶ 8.

That company, Defendant Premier Biotech, Inc., "servic[ed] a customer contract that, for

regulatory reasons, the Plaintiff could no longer serve."  Id.  Bailey began working as a

1099 consultant for Plaintiff in September 2011.  Id. at ¶ 9.  He received a larger

commission "in lieu of his previous salary."  Id.  No written agreement covered this change.

Id. at ¶ 10.  Bailey retained the title of Vice President of Sales and Marketing through

November 2013, "and the levels of information he received related to Plaintiff and its

business remained substantially the same."  Id.

Plaintiff had an account to provide "point of care" drug testing to the Arkansas

Department of Health and Human Services ("ARDHHS") before 2016.  Id. at ¶ 11.

Defendant Bailey, who did not serve as the account's sales representative, was aware of

the contract because he sat in on client meetings in New York and his job made him

aware of the contract provisions.  Id. at ¶ 12.  ARDHHS also had another contract with one

of Plaintiff's competitors for "lab service" drug testing.  Id. at ¶ 13.  ARDHHS had problems

with this competitor's work.  Id. at ¶ 14.  Bailey recommended to ARDHHS that the

Department replace the competitor as provider of these services with Defendant Premier,

not Plaintiff.  Id.  As a result of Bailey's recommendation, Premier received the contract.

Id. at ¶ 15.

In July 2016, Plaintiff became aware that Premier had quoted prices to ARDHHS

for "point of care" drug testing "that matched the Plaintiff's pricing."  Id. at ¶ 16.  Plaintiff's

representatives confronted Bailey about Premier's activities, and Bailey "repeatedly stated"

that Premier would stop marketing the "point of care" tests to ARDHHS.  Id. at ¶ 17.

Despite this promise, Plaintiff's "main contact" with the Department began to be excluded

from meetings related to the ARDHHS point-of-care program.  Id. at ¶ 18.  The "main contact" had been included in such meetings before that point.  Id.  Plaintiff learned in December 2016 that Premier had been awarded ARDHHS' contract for "point-of-care" testing effective January 1, 2017.  Id. at ¶ 19.  That contract had typically provided Plaintiff more than $200,000 in gross annual revenue.  Id.  Plaintiff subsequently found out that Premier had provided ARDHHS with a "six-month pilot program" for "point of care" testing.  Id. at ¶ 20.  Plaintiff was still servicing the ARDHHS contract at the time.  Id.  Bailey's conduct with respect to ARDHHS led Plaintiff to terminate its relationship with Bailey on December 23, 2016.

Plaintiff also had a contract with the Michigan Department of Corrections ("DOC").  Id. at ¶ 22.  Over the fourteen or more years that this contract endured, Plaintiff supplied the Department with drug testing kits.  Id.  The contract typically generated between $800,000 and $1 million in revenue per year.  Id.  During his employment and consultancy with Plaintiff, Bailey managed that contract.  Id. at ¶ 23.  DOC informed Plaintiff in 2012 that state regulations required the Department to request proposals rather than offer a simple renewal to current contractors.  Id. at ¶ 24.  Plaintiff could avoid that requirement, however, if it supplied its products through a Community Rehabilitation Organization ("CRO") that proved itself a "worthy supplier" of materials.  Id.  The CRO had to meet certain standards for quality, function, and quantity to qualify as a worthy supplier.  Id.  Beginning in 2012, Plaintiff worked with Peckham Vocational Industries, Inc. ("Peckham"), a CRO in the State of Michigan, to package products supplied by Plaintiff.  Id. at ¶ 25.  Peckham would then distribute the products to the DOC.  Id.  Defendant Bailey was Plaintiff's primary contact with Peckham.  Id. at ¶ 26.  Without informing Plaintiff, Bailey

7

told Peckham that he "was contacting Peckham on behalf of both the Plaintiff and Defendant Premier." Id. at ¶ 27. Over a five-year period, Plaintiff spent significant resources and energy to make sure Peckham could package Plaintiff's products and distribute them to DOC. Id. at ¶ 28. These efforts led Peckham to be deemed a "worthy supplier." Id. Plaintiff's contract with DOC got extended "by exception" over that period. Id. at ¶ 28.

In 2016, DOC informed Plaintiff that it would request proposals from CROs for the drug-testing products, rather than contract with Peckham. Id. at ¶ 29. As explained above, Plaintiff had terminated its consulting relationship with Bailey on December 23, 2016. Id. at ¶ 30. Plaintiff contacted Peckham about preparing a proposal to deliver to DOC in January 2017. Id. at ¶ 31. Peckham made no mention of ending its relationship with the Plaintiff. Id. The DOC's request for proposals appeared on February 3, 2017. Id. at ¶ 32. Proposals were due by March 3, 2017. Id. at ¶ 32. On February 10, 2017, Peckham informed Plaintiff that it would propose to package Defendant Premier's products, rather than Plaintiff's. Id. at ¶ 33. Plaintiff sought another CRO, but was unable to find one on such short notice. Id. at ¶¶ 34-35. Instead, Plaintiff submitted a proposal without a partner CRO. Id. at ¶ 36. Peckham submitted a proposal with Defendants. Id. at ¶ 37. That proposal specifically relied on Peckham's experience in the program that Plaintiff had funded and organized, as well as information obtained by Bailey in his years working for Plaintiff. Id. at ¶¶ 38-39. Peckham claimed a five-year relationship with Defendant Premier and Premier's experience in Arkansas, but that relationship was actually established with Plaintiff and the Arkansas experience was Plaintiff's, not Premier's. Id. at ¶¶ 40-41. The proposal included documents and procedures "materially

8

identical" to those used by Plaintiff. Id. at ¶ 42. Defendant Bailey had received such documents and materials during his employment with Plaintiff. Id. In July, 2017, Michigan regulators awarded the contract to Peckham. Id. at ¶ 43. Plaintiff protested, but the decision did not change. Id. at ¶¶ 44-45. Officials estimated the value of the contract over three years to be $1,872,309, but Plaintiff anticipates the actual value to be greater. Id. at ¶ 46.

Plaintiff has a contract with the Northeastern Association for the Blind at Albany ("NABA"). Id. at ¶ 47. NABA–a non-profit located in Albany–packages and distributes Plaintiff's products. Id. Those products can then be sold through the New York State Preferred Source Program for People who are Blind. Id. State and local agencies are required to purchase goods and services from that program. Id. NABA's products and prices are public information, but the prices at which Plaintiff sells its products to NABA are "confidential and proprietary." Id. at ¶ 48. So are NABA's mark-ups. Id. Bailey had access to Plaintiff's confidential pricing information and attended meetings with NABA on Plaintiff's behalf. Id. at ¶ 49. Plaintiff has become aware that Bailey contacted NABA while still employed by Plaintiff "to establish a contract with NABA to sell Premier products" through the state agency. Id. at ¶ 50. The products Premier sells are similar and Premier has used Bailey's knowledge to undercut Plaintiff's pricing to NABA. Id. at ¶ 51.

During his tenure with Plaintiff, Bailey attended various meetings designed to establish a business relationship between AMBC and the Untied States Department of Defense ("DOD"). Id. at ¶ 52. Plaintiff hoped to sell DOD drug testing equipment. Id. Plaintiff paid travel expenses for Bailey and for a consultant to attend meetings with DOD. Id. at ¶ 53. Plaintiff never developed a business relationship with DOD or generated any

business from Bailey's efforts.  Id. at ¶ 54.  After his termination, however, Premier

obtained a contract with DOD.  Id. at ¶ 55.  In an effort to obtain more business, Bailey

contacted Plaintiff's consultant.  Id. at ¶ 56.  Bailey did not inform the consultant that he no

longer represented the Plaintiff.  Id.

Plaintiff's proposed Amended Complaint contains nine causes of action.  All nine

name Todd Bailey, and two name Premier Biotech, Inc.  Counts 1-4 allege various types

of contractual breaches because of Bailey's alleged use of confidential information to

poach clients and steal business from Plaintiff.  Plaintiff seeks both injunctive relief and

compensatory damages.  Counts 5 and 6 allege misappropriation of trade secrets and

seek both damages and an injunction.  Count 7 alleges a breach of Bailey's duty of loyalty

to the Plaintiff and business interference in Bailey's negotiations with the Department of

Defense.  Count 8 alleges that Bailey and Premier tortiously interfered with Plaintiff's

contract with Peckham.  Count 9 alleges unjust enrichment by both Defendants because

of the bid they submitted to the Michigan DOC, which cost Plaintiff a contract with that

agency.

### ii.    Analysis of Claims

Plaintiff seeks to amend/supplement the Complaint to include the additional

information and substitute the claims listed above for those in the original Complaint.  The

proposed Amended/Supplemented Complaint also named only the parties over which the

Court has personal jurisdiction.  As Defendants object to the proposed

Amended/Supplemented Complaint as futile on every claim, the Court will address each

Count in turn.

### a. Breach-of-Contract Claims

Several of Plaintiff's claims are breach-of-contract claims raised against Bailey. In New York, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 16 N.Y.S. 3d 298, 2015 N.Y. App. Div. LEXIS 6711 at *2 (2d Dept. Sept. 16, 2015). With this standard in mind, the Court will address the parties' arguments regarding each of the claims.

### 1. Count 1.

Count 1 alleges that "Bailey's Employee Compliance Certification states that Defendant may not use any confidential or proprietary information he acquires in the course of his employment with Plaintiff for any purpose other than to perform his duties" as Plaintiff's employee. Supp. Complt. at ¶ 58. This Certification defines "proprietary information" as "(among other information) business plans and strategies, financial information and forecasts, marketing strategies and information, information regarding customers and their specialized agreements, and information regarding customer contracts." Id. at ¶ 59. Plaintiff alleges that Bailey "used confidential information acquired during his employment with the Plaintiff–in particular regarding the specialized requirements of the Plaintiff's relationship with DOC, such as the need for involvement of a CRO, Peckham's availability and experience in performing that specialized service, and Peckham's financial arrangements with the Plaintiff–to advance" Premier's interests. Id. at ¶ 60. Plaintiff alleges that this conduct violated the Employee Compliance Certification.

Id. at ¶ 61.  That breach threatens Plaintiff's relationship with DOC, and has already

caused economic damage.  Id. at ¶¶ 63-66.

Defendants argue that Plaintiff has not alleged that Bailey violated the

confidentiality agreement in his contract.  Information on "the specialized requirements of

the Plaintiff's relationship with DOC, such as the need for involvement of a CRO, and on

Peckham's ability to perform the services was not confidential information, but information

publically available.  That information, Defendant contends, appears on the Michigan

DOC's website.  Moreover, pricing information on Plaintiff's DOC contract is publically

available and therefore not proprietary.  The financial arrangements with Peckham are not

confidential, and Plaintiff did not have a contractual relationship with Peckham in any

case.

The question before the Court is whether Plaintiff has pled facts sufficient to make it

plausible that Bailey violated the clause in his agreement prohibiting the disclosure of

"Proprietary Information," as defined by the contract.  The agreement defines Proprietary

Information as:

> ABMC's internal operating systems and procedures, ABMC's current and
> future business plans and strategies, (including but not limited to analytical
> methods and procedures, financial information, forecasts and forecast
> assumptions), marketing strategies or information, knowledge concerning
> ABMC's customers and their specialized requirements (including but not
> limited to any customer lists or databases pertaining to existing customers,
> information related to past or prospective customers, data about the terms,
> conditions and expiration dates of existing relationships or contracts with
> customers), any technical data, new or existing product or service concepts
> or ideas, know-how (trade secrets), any and all information related to
> ABMC's research and development activities, manufacturing, products,
> inventions, formulas, processes, designs, drawings and service and
> operation manuals and documentation.
>
> Proprietary Information shall mean all notes, memoranda, files, records,

12

writing or other documents which Employee has, in the past, or shall after full execution of this Agreement, prepare, use or come into contact with during his/her employment with ABMC, which relate to any of the above or are useful in any manner to the business of ABMC. Proprietary Information shall also include any and all information and materials in ABMC's possession or under ABMC's control for any other person or entity which ABMC is obligated to treat as confidential or proprietary, and any and all information not generally known to the public or within industries or trades in which ABMC competes. The definition of Proprietary Information applies, to all communications, including written, electronic and oral, and without regard, to whether any specific matters would be deemed confidential, material or important or whether any specific matters would be deemed, patentable or copyrightable.

The obligations noted above shall not apply to: Information that immediately prior to or at the time of disclosure is, or thereafter becomes, available to the general public, Information that has been lawfully obtained by me from an independent third party without breach of the obligations noted above as shown by sufficient document that establishes the third party as the source of the Information and that the third party has not obtained the Information from ABMC, or Information that I can establish, by documented and competent evidence, was in my possession prior to my employment with ABMC.

See Exh. B to Plaintiff's Proposed Supplemental/Amended Complt. ("Employee Compl. Cert."), dkt. # 39-4, at ¶ 1. Bailey's obligation to keep this information confidential "remain[ed] in effect until such time as the information is no longer confidential or secret and is known to the general public, and my obligations related to the information survives any termination or resignation of my employment with ABMC." Id.

Plaintiff's proposed pleading alleges that Defendant disclosed a variety of information in conjunction with Premier's efforts to obtain a contract with the Michigan DOC. Plaintiff alleges that Premier and Peckham worked together on Peckham's submission for the DOC contract as a CRO. Supp. Complt. at ¶ 33. Peckham's proposal relied on a "pilot program" in which it had participated with Plaintiff. Id. at ¶ 38. "In its proposal, Peckham relied specifically upon Todd Bailey's familiarity with DOC's staff and

13

personnel, which was established over a period of years at the Plaintiff's expense." Id. at ¶ 39. Peckham's proposal claimed a "five-year relationship with Defendant Premier," but Plaintiff alleges that "the relationship between Peckham and Todd Bailey was established and built at the expense, and for the benefit, of the Plaintiff, rather than Premier." Id. at ¶ 40. Peckham also relied on Premier's prior experience in Arkansas, "but Todd Bailey participated in managing ARDHHS accounts on behalf of the Plaintiff as well as Premier, and the events characterized in Peckham's proposal precipitated the termination of Todd Bailey's relationship with the Plaintiff." Id. at ¶ 41. Peckham's proposal included a copy of Premier's product recall policy, "but that document [was] materially identical to the Plaintiff's own product recall procedures, which were internal quality control materials disseminated to Todd Bailey in the course of his employment with the Plaintiff." Id. at ¶ 42. The other confidential information relied on in Peckham's proposal, Plaintiff alleges, consisted of "information regarding the specialized requirements of the Plaintiff's relationship with DOC, such as the need for the involvement of a CRO, Peckham's availability and experience in performing that specialized service, and Peckham's financial arrangement's with Plaintiff[.]" Id. at ¶ 60.

The Court finds that most of the information alleged by Plaintiff does not qualify as Proprietary Information–and therefore protected–under the terms of the agreement. First, as explained, Proprietary Information does not include "[i]nformation that immediately prior to or at the time of disclosure is, or thereafter becomes, available to the general public, Information that has been lawfully obtained by me from an independent third party without breach of the obligations noted above as shown by sufficient document that establishes the third party as the source of the Information and that the third party has not obtained

14

the Information from ABMC[.]"  Employee Compl. Cert. at ¶ 1.  Information about the

requirements for contracting with the Michigan Department of Corrections is information

from a publically available source, as Plaintiff acknowledges.  Allegations regarding

Bailey's general experience working with DOC, the state of Arkansas, and Peckham as a

AMBC employee represents general experience and does not allege any of the specific

types of information and knowledge covered by the agreement.  Plaintiff does allege that

Bailey used Plaintiff's own recall policy in Peckham's proposal.  As Defendants argue,

however, a recall policy is hardly confidential and proprietary; the policy is one designed to

become "available to the general public" and is not covered by the agreement.  Bailey also

allegedly used knowledge of "Peckham's availability and experience in performing that

specialized service, and Peckham's financial arrangements with Plaintiff."  The Court fails

to see how "Peckham's availability and experience in performing that specialized service"

constitutes confidential and proprietary information in Plaintiff's possession.  Peckham's

experience and availability belongs to Peckham, not Plaintiff, and Plaintiff does not allege

any agreement with Peckham not to share that information.  Moreover, though the

agreement covers "knowledge concerning ABMC's customers and their specialized

requirements," Peckham was not Plaintiff's customer, but a partner.

    Read generously, however, Plaintiff's complaint that Bailey used information about

Plaintiff's financial arrangements with Peckham could be covered by that portion of the

agreement that prohibits using information about "ABMC's current and future business

plans and strategies."  Employee Compl. Cert. at ¶ 1.  Employing the Rule 12(b)(6)

standard and making all inferences in Plaintiff's favor, that allegation implies that Plaintiff

violated the Employee Compliance Certification by using his knowledge of Plaintiff's

business plans and strategies–which Plaintiff alleges included a plan to use Peckham's position and services in certain ways and at certain rates–to obtain a contract with the Michigan DOC. Plaintiff's claim here is a contract claim founded on the obligations stated in the Employee Compliance Certification. Plaintiff has plausibly alleged that Defendant Bailey violated the confidentiality agreement stated in that contract. Whether Bailey actually used Plaintiff's confidential and proprietary business strategies and methods in a way that violated the agreement is a question that will be answered after discovery on this issue. The Court therefore finds that supplementing the claim in this respect is not futile, and will grant the Plaintiff's motion in this respect.

### 2. Count 2

Defendants argue that Count 2 of the Proposed Amended Complaint is futile as well. Defendants contend that Plaintiff's allegations fail to demonstrate any damage from the alleged breach of contract as it relates to Plaintiff's dealings with NABA. Plaintiff does not explain how AMBC lost revenue as a result of the alleged breach. Moreover, Plaintiff alleges that NABA is a distributor, not a customer. Nothing in the proposed Amended Complaint, Defendants point out, indicates that Plaintiff could not also have made a contract with NABA.

Count 2 alleges that "Defendant Bailey used confidential information acquired during his employment with the Plaintiff–in particular information regarding the Plaintiff's sales strategies, profit margins, and pricing on the NABA contract, and NABA's price mark-up–to advance the interests of Defendant Premier, enabling Premier to undercut the Plaintiff's prices through its own contract with NABA." Supp. Complt. at ¶ 70. Plaintiff further alleges that Defendant Bailey's breach "damaged" Plaintiff "through lost revenues

in an amount not yet to be determined." Id. at ¶ 72.  Count 2 also references Plaintiff's

earlier allegations concerning NABA, which included that "NABA packages and distributes

the Plaintiff's products," which could then be sold to state and local agencies.  Id. at ¶ 47.

Using information about Plaintiff's pricing on products sold through NABA, Premier sold

similar products and "undercut the Plaintiff's pricing using confidential ABMC pricing

information."  Id. at ¶ 51.

　　For the reasons stated on Count 1, the Court finds that amending and

supplementing the Plaintiff's Complaint to include these allegations would not be futile.

Here, Plaintiff alleges that Defendant Bailey used information covered by the

confidentiality provisions of the employment contract to harm Defendant by assisting

Premier to sell substantially similar products at lower prices.  Such alleged conduct

certainly implicates Plaintiff's confidential business strategies and therefore alleges a

breach of contract.  Defendants' contention that Plaintiff has not sufficiently pled damages

is also unpersuasive.  Defendants are correct that "an allegation that defendant 'suffered

damages' without particular facts as to how she was damaged does not satisfy" the

federal pleading requirements.  International Business Machines Corp. v. Dale, No. 7:11-

cv-951, 2011 WL 4012399 at *2 (S.D.N.Y. Sept. 9, 2011).  In Dale, the defendant's

counterclaim alleged "damages in the amount of $150,000 without an explanation for how

she was damaged."  Id.  That is not the case here.  Plaintiff alleges damages, without

stating a particular amount, contending that amount cannot yet be determined.  Plaintiff

certainly explains the cause of the damage here: a breach of the employment agreement

in which Bailey used confidential information to undercut Plaintiff's prices and take

business away from the company.  Plaintiff alleges an injury caused by a breach of

17

contract, and an amended Complaint that states that injury would not be futile.

As such, Plaintiff's motion will be granted in this respect.

### 3. Count 3

Count 3 alleges that Defendant Bailey's Employee Compliance Certification prohibits direct and indirect solicitation of Plaintiff's "suppliers, customers, employees, distributors, sub-distributors or consultants" for one year after the end of Bailey's employment. Supp. Complt. at ¶ 74. Defendant contends that Bailey's employment ended on December 23, 2016. Id. at ¶ 75. Plaintiff alleges that Bailey's work to obtain Peckham's assistance with the Michigan Contract amounts to a violation of the non-solicitation agreement. Id. at ¶¶ 76-83

Defendants contend that this count should be dismissed because the non-solicitation agreement in Bailey's contract expired one year after his termination or resignation from employment with AMBC. That agreement states that "[d]uring and for a period of one (1) year after my termination or resignation from employment with [Plaintiff], I will not directly or indirectly solicit suppliers, customers, employees, distributors, sub-distributors or consultants of ABMC for my benefit or for the benefit of any other party." Employee Compl. Cert., at ¶ 2. Plaintiff admits that the agreement appears to place a one-year limit on the non-solicitation agreement after the end of the employment relationship. Plaintiff argues, however, that Bailey had a "1099 consulting relationship" with Plaintiff that extended beyond the termination of his employment contract and "he continued to manage those customers' accounts on the plaintiff's behalf." As such, the non-solicitation agreement still applied.

The Court finds that amendment/supplementation would be futile with respect to

18

any non-solicitation claims in Count 3.  The non-solicitation clause in the contract expires one year after the termination of employment with the Plaintiff.  Plaintiff's proposed supplemented/amended Complaint alleges that "in 2009, with the Plaintiff's knowledge and consent, Bailey founded his own company, defendant Premier, in order to continue servicing a customer contract that, for regulatory reasons, the Plaintiff could no longer service."  Proposed Supplemental/Amend Comptl. at ¶ 8.  Then, "[i]n September, 2011, Bailey transitioned into a 1099 consulting relationship with the Plaintiff, whereby Bailey received an increased commission on sales in lieu of his previous salary."  Id. at ¶ 9.  The non-solicitation agreement quoted above ends one year after termination of employment.

Here, Plaintiff admits that Bailey's employment ended and became a consultancy in 2011. A consultant is not an employee.[2]  Plaintiff is correct to argue that the determination of whether a person is an employee or independent contractor is normally a question of fact for a jury to determine.  See, e.g., Carlson v. American Intl. Group, Inc., 30 N.Y.3d 288, 301 (N.Y. 2017) ("In various . . . contexts, we and other courts have held that the determination of whether someone is an independent contractor is a fact-specific question.").  The Court finds that a jury need not make this determination, however, since Plaintiff has admitted that Bailey stopped being an employee after 2011 and became a consultant.  The plain language of the agreement precludes Plaintiff's claim that Bailey breached the non-solicitation agreement in his Employee Compliance Certification.  The

---

[2]As the IRS explains, "[p]ayers use Form 1099-MISC, *Miscellaneous Income*, to: Report payments made in the course of a trade or business to a person who's not an employee or to an unincorporated business." https://www.irs.gov/faqs/small-business-self-employed-other-business/form-1099-misc-ind ependent-contractors (visited 9/21/2018).

solicitation Plaintiff alleges occurred well more than a year after the end of Plaintiff's employment.

The motion will be denied in this respect.

### 4.    Count 4

Defendants also contend Count 4 in the proposed supplemental/amended Complaint is futile.  That count alleges that Defendant breached the non-solicitation agreement in the employee contract in 2016 through his contacts with ARDHHS.  See Supp. Complt. at ¶¶ 86-89.

For the reasons explained above in connection with Count 3, the Court finds that supplementing the Complaint would be futile in this respect.  The Court will therefore deny the Plaintiff's motion in this respect.

### b.    Misappropriation of Trade Secrets

Defendants claim that Counts 5 and 6 in the proposed Supplemental/Amended Complaint, which allege misappropriation of trade secrets, are also futile.

In New York, a plaintiff claiming misappropriation of a trade secret must show:  "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Integrated Cash Mgmt. Serv., Inc. v. Dig. Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990); see Norbrook Lab. Ltd. v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463, 482 (N.D.N.Y. 2003).  A party claiming misappropriation must first demonstrate the existence of a trade secret.  In New York, courts define a trade secret using the first Restatement of Torts Section 757.  See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir.

1999).  A trade secret is "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not use it.'" <u>Ruckelshaus v. Monsanto co.</u>, 467 986, 1001 (1984) (quoting RESTATEMENT OF TORTS § 757, Comment b).  Courts use six factors in determining the existence of a trade secret:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

<u>Ashland Mgmt. Inc. v. Janien</u>, 82 N.Y.2d 395, 407 (1993) (quoting <u>Restatement (First) of Torts</u> § 757, cmt *b* (1939)).  "'[U]se' of a trade secret" can "include 'any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant,' including 'marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret.'" <u>Next Communication, Inc. v. Viber Media, Inc.</u>, No. 14-cv-8190, 2016 WL 1275659 at *4 (S.D.N.Y. Mar. 30, 2016) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (Am. Law. Inst. 1995)).

In New York, "a trade secret 'may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advanage over competitors who do not know or use it.'" <u>Hudson Hotels Corp. v. Choice Hotels Intl'l, Inc.</u>, 995 F.2d 1173, 1176 (2d Cir. 1993) (quoting Restatement of Torts § 757 cmt. b (1939); <u>Delta Filter Corp. v. Morin</u>, 108 A.D. 2d 991

(App. Div. 3d Dept 1975)).  An idea can constitute a trade secret, but "an action will not sound in tort for the misappropriation of an idea unless the idea was novel." Id. at 1178. This rule exists because "'non-novel ideas are not protectible as property[;] they cannot be stolen.'" Id. at 1179 (quoting Murray v. National Broadcasting Co., 844 F.2d 988, 993 (2d Cir. 1988)).  "[A] trade secret is 'not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business.'" Bear Stearns Funding, Inc. v. Interface Group–Nev., Inc., 361 F.Supp.2d 283, 305 (S.D.N.Y. 2005) (quoting Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997)).  "'A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable asset.'" Norbrook Labs v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463, 483 (N.D.N.Y. 2003) (quoting Minnesota Mining & Mfg. Co. v. Pribyl, 249 F.3d 587, 595-96 (7th Cir. 2001).  "The existence . . . of a trade secret usually is treated as a question of fact."  Chevron U.S.A., Inc. v. Roxen Service, Inc., 813 F.2d 26, 29 (2d Cir. 1987).

### 1.    Count 5

In Count 5, Plaintiff alleges that "Bailey had access to proprietary and confidential information regarding the Plaintiff's contracts, pricing, product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the Plaintiff's industry" during his employment with AMBC.  Supp. Complt. at ¶ 91.  That information, Plaintiff alleges, had been "gathered through significant time, effort, and cost," and allowed "Plaintiff to gain an advantage over competitors within the Plaintiff's industry who do not

22

have access to the same." Id. at ¶ 92.  Plaintiff alleges that Bailey used particular

information to advance Premier's interests in competing with AMBC.  Plaintiff alleges that

Bailey used "the status of the Plaintiff's contract with DOC, the involvement of Peckham in

continuance of the contract, and the Plaintiff's internal costs and profit margins with regard

to that contract" in this effort.  Id. at ¶ 93.  Plaintiff seeks both injunctive relief and

damages concerning this alleged misappropriation of trade secrets.

    Defendants' contends that Plaintiff has not alleged the existence of a trade secret

and did nothing to attempt to protect any trade secret that may have existed.  Accepting

the allegations here as true, however, Plaintiff has plausibly alleged the existence of trade

secrets, if barely.  Read as a whole, and making all inferences in Plaintiff's favor, Plaintiff's

complaint alleges that AMBC developed and used a compilation of information about

marketing, pricing, packaging, and selling testing kits to the Michigan DOC that provided

the company with a significant advantage over competitors.  As explained in connection

with the breach-of-contract claims, not all of Plaintiff's allegedly confidential information

could constitute a trade secret, but at this stage in the litigation that allegation is

sufficiently pled.  Likewise, the question of whether Plaintiff acted adequately to protect the

information is best left until after discovery.  As discussed above, Plaintiff made an effort

through a confidentiality agreement to keep the alleged trade secrets confidential.  Plaintiff

will be required, of course, to point to actual trade secrets in sufficient detail after

discovery.  The Court will therefore grant the Plaintiff's motion in this respect.

### 2.    Count 6

    Count 6 alleges that Defendant Bailey misappropriated trade secrets in connection

with Plaintiff's and Premier's dealings with NABA.  Plaintiff alleges that, while employed at

AMBC, Bailey gained "access to propreitary and confidential information regarding the Plaintiff's contracts, pricing, product costs, internal sales strategies, legal and regulatory procedures, and competitive positions within the Plaintiff's industry."  Supp. Complt., at ¶ 101.  Plaintiff further alleges that the information in question had been "gathered through significant time, effort, and cost[.]"  Id. at ¶ 102.  That information also allegedly allowed "Plaintiff to gain an advantage over competitors within the Plaintiff's industry who [did] not have access to the same."  Id.  When it came to competing against Plaintiff in relation to the NABA contract, Bailey "used such information–in particular, information regarding Plaintiff's sales strategies, profit margins, and pricing on the NABA contract, and NABA's price mark up[.]"  Id. at ¶ 103.

For the reasons stated above, the Court finds that the proposed Complaint is not futile in this respect either.  Plaintiff will of course have to provide sufficient detail about the trade secrets alleged and show they did not constitute public knowledge to survive a motion for summary judgment or to prevail at trial, but at this point in the litigation the Court cannot find a right to relief implausible on the facts alleged.  Plaintiff's motion will be granted in this respect.

### c.    Breach of Duty of Loyalty/Diversion of Corporate Opportunity

Count 7 of the proposed Supplemental/Amended Complaint alleges that Bailey, either as an employee or a consultant, owed a duty of loyalty "with regard to the Plaintiff's existing and prospective customers."  Supp. Complt., at ¶ 107.  Plaintiff alleges that Defendant "met with the U.S. Department of Defense on multiple occasions at the Plaintiff's expense and putatively on the Plaintiff's behalf for the purpose of securing a

24

contract between the Department of Defense and Plaintiff." Id. at ¶ 108. While Bailey did

not secure a contract with the Department of Defense for Plaintiff, he secured one for

Premier shortly after ending his relationship with Plaintiff. Id. at ¶ 109. Plaintiff alleges

Bailey "neglected to use the knowledge, relationships, and resources he secured for the

benefit of the Plaintiff, and instead used them for his own benefit and the benefit of

Premier." Id. at ¶ 110. That damage injured Plaintiff by "diverting a corporate

opportunity." Id. at ¶ 111.

In New York, an employee cannot "appropriate corporate assets or opportunities to

himself or to a new corporation formed for that purpose." Greenberg v. Greenberg, 206

A.D.2d 963, 964 (4th Dept. 1994). "The doctrine of 'corporate opportunity' provides that

corporate fiduciaries and employees cannot, without consent, divert and exploit for their

benefit any opportunity that should be deemed an asset of the corporation." Alexander &

Alexander v. Frtizen, 542 N.Y.S.2d 530, 533 (1st Dept. 1989). "The obligation of loyalty

implied by the relationship between an employee and his (her) employer rests upon the

rule that a person who undertakes to act for another shall not in the same matter act for

himself (herself)." Id. at 534. "A corporate opportunity is defined as any property,

information, or prospective business dealing in which the corporation has an interest or

tangible expectancy or which is essential to its existence or logically and naturally

adaptable to its business." Greenberg, 206 A.D. 2d at 964.

Defendants argue that these allegations fail to state a claim under either of the

tests outlined above. They first contend that Plaintiff cannot meet the "tangible

expectancy" test because Plaintiff's allegations concerning the likelihood of a contract with

the DOD represent a mere hope, which is insufficient to state a claim. Plaintiff alleges that

Bailey, while working for AMBC, "attended various meetings for the purpose of establishing a business relationship between Plaintiff and the U.S. Department of Defense[.]" Supp. Complt. at ¶ 52. Plaintiff hoped to sell the Department drug-testing equipment. Id. "Plaintiff never developed a business relationship with the Department of Defense nor saw any business from Bailey's activities." Id. at ¶ 54. Premier got such a contract "after Bailey's termination." Id. at ¶ 55.

The Court agrees with the Defendants that these allegations do not state a claim that AMBC had a tangible expectancy of a business relationship with the Department of Defense. "A tangible expectancy is 'something much less tenable than ownership, but . . . more certain than a desire or hope.'" Moser v. Devine Real Estate, Inc., 42 A.D.3d 731, 735 (3d Dept. 2007) (quoting Alexander & Alexander, 542 N.Y.2d at 247-48). Plaintiff here admits that it did not have a business relationship with DOD, but simply hoped for a future one, and that the company never had any business relationship with DOD during Bailey's time with the company, either as employee or consultant. Plaintiff's argument that this expectancy of an agreement was more than a mere hope is unpersuasive. Plaintiff contends that AMBC sent Bailey to have numerous meetings with the Department of Defense, and intended and expected those meetings to lead to a contract. The fact that Premier secured a contract, Plaintiff contends, is evidence of Plaintiff's tangible expectancy. The Court disagrees. Plaintiff's argument describes a hope that business meetings would lead to a contract. A hope is not a tangible expectancy.

Defendants next argue that Plaintiff has not pled facts sufficient to meet the essential element test. To satisfy that test, a plaintiff must allege that "the opportunity . . . was 'necessary' for or 'essential' to its business such that 'the consequences of

deprivation are so severe as to threaten the viability of the enterprise.'" Moser, 42 A.D. 3d

at 735 (quoting Alexander & Alexander, 542 N.Y.2d at 248).   The Court finds that Plaintiff

has not stated a plausible claim in this respect either.  Plaintiff nowhere alleges that failing

to obtain the DOD contract that went to Premier threatened the viability of the enterprise.

As such, Plaintiff has not alleged facts sufficient to support a diversion of corporate

opportunity claim.[3]

### d.    Tortious Interference

Defendants also argue that Count 8, which alleges tortious interference in a

contract between Peckham and Bailey interference by Bailey and Premier, is futile.  In

New York, a party proves tortious interference with contract by showing "(1) a valid

contract between the plaintiff and a third party; (2) the defendant's knowledge of that

contract; (3) the defendant's intentional procurement of the third party's breach of that

contract; and (4) damages."  Iacono v. Pilavas, 125 A.D.3d 811, 812, 4 N.Y.S.3d 250, 252

(2d Dept. 2015) (citing Flushing Expo, Inc. v. New World Mall, 116 A.D.3d 826, 985

N.Y.S.2d 247 (2d Dept. 2014)).  Defendants argue that the Court has already found that

---

[3]The parties offer no argument concerning a claim for breach of duty of loyalty,
even though Plaintiff's claim mentions that tort.  New York courts hold that an employee or
agent "is prohibited from acting in any manner inconsistent with his agency or trust and is
at all times bound to exercise the utmost good faith and loyalty in the performance of his
duties."  Lamdin v. Broadway Surface Advertising Corp., 272 N.Y. 133, 138 (NY 1936).  If
"the employee engages in business which, by its nature, competes with the employer's a
double breach of duty occurs.  'Not only is the principal deprived of the services for which
he has contracted, but he finds these services turned against himself.'"  Maritime Fish
Products, Inc. v. World-Wide Fish Products, Inc., 100 A.D.2d 81 (1st Dept. 1984) (quoting
Reis & Co v. Volck, 151 App. Div. 613, 615 (1st Dept. 1912)).  Plaintiff's claim here fails.
The allegations indicate that Premier did not engage in business with DOD until Bailey left
Plaintiff's employ, a point at which he no longer had a duty of loyalty to his former
employer.

no contract existed between Peckham and Plaintiff, and therefore no tortious interference claim could lie.  Plaintiff does not respond to this argument.

The Court agrees that the proposed pleading would be futile in this respect.  A tortious interference claim requires the existence of a contract, and Plaintiff has not alleged any such agreement with Peckham.  The Court will deny Plaintiff's motion as it relates to this claim.

### e.    Unjust Enrichment

Finally, Defendants argue that Plaintiff's attempt at pleading a claim for unjust enrichment against Bailey and Premier in Count 9 is also futile.  They argue that Plaintiff has not alleged that Defendants received something of value which belonged to Plaintiff, and the claim must therefore fail.  Moreover, Plaintiff has not alleged that Defendant Bailey profited from the alleged unjust enrichment.  Bailey did not make any contract with the Michigan DOC, and he is not legally responsible for the money paid to Premier, a corporation.

In New York, a claim for unjust enrichment requires a showing that "'(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'" GFRE, Inc. v. U.S. Bank, N.A., 130 A.D.3d 569, 570, 13 N.Y.S.2d 452, 454 (2d Dept. 2015) (quoting Mobarak v. Mowad, 117 A.D.3d 989, 1001, 986 N.Y.S.2d 539 (2d Dept. 2014)).  "Such a claim is undoubtedly equitable and depends upon broad considerations of equity and justice." Paramount Film Distributing Corp. v. State, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972).  Courts consider "if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if

28

there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." Id. Such a claim, however, "is not a catchall cause of action to be used when others fail." Corsello v. Verizon, N.Y., Inc., 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732 (2012). The tort applies "only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Id. Unjust enrichment applies when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." Id. Such a claim cannot serve to "[duplicate] or [replace], a conventional contract or tort claim." Id.

Count 9 of the prosed pleading alleges that Bailey, Premier, and Peckham combined to "[submit] a proposal to supply drug test kits to DOC, to the exclusion of Plaintiff[.]" Supp. Complt. at ¶ 120. Defendants' and Premier's actions led those three to be awarded a contract worth more than $1.8 million, "and Plaintiff to be denied the same." Id. Plaintiff further alleges that AMBC "made significant investments of time, effort, and money over a period of years to ensure that Peckham was suitably prepared to package and distribute products to DOC as required under the contract[.]" Id. at ¶ 121. These "investments" are what qualified Peckham to obtain the "worthy supplier" status necessary to obtain the contract. Id. Under those circumstances, Plaintiff alleges, "[e]quity and good conscience dictate that Defendants . . . should not be permitted to retain the significant gains of the contract award," which came at "Plaintiff's expense." Id. at ¶ 122.

The Court agrees with the Defendants that such allegations fail to state a claim for unjust enrichment. New York courts have defined the "essence" of unjust enrichment as a situation where "one party is in possession of money or property that rightly belongs to

another." Clifford R. Gray, Inc. v. LeChase Constr. Servs, LLC, 819 N.Y.S. 2d 182, 187 (3d Dept. 2006). Here, the Plaintiff alleges that, due to the Defendants' misconduct, a bid that should have been prepared by Plaintiff and Peckham was prepared by Premier and Peckham. The money and property that rightly belonged to Plaintiff that Defendants received, Plaintiff alleges, was the contract payment from the Michigan DOC. Plaintiff's allegation is not that property that was rightly Plaintiff's ended up in Defendants' hands. Instead, Plaintiff's allegation is that Defendants interfered in the process of bid preparation between Peckham and Plaintiff. The money that came from that bid process could not be considered the property of anyone but the Michigan DOC until the contract was awarded and paid out. Plaintiff's claim here is essentially an attempt to state a tort claim in equity. Plaintiff alleges Defendants improperly used Plaintiff's knowledge to construct a winning bid. As explained, however, unjust enrichment occurs when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." Corsello, 18 N.Y.3d at 790. Such a claim cannot serve to "[duplicate] or [replace], a conventional contract or tort claim." Id.

The Court therefore agrees with Defendants that Plaintiff's proposed pleading would be futile with respect to the unjust enrichment claim. The Plaintiffs motion will be denied in this respect.

### f. Conclusion as to the Motion to Amend/Supplement

As explained above, the Court finds that, Plaintiff's proposed Supplemental/Amended Complaint states claims upon which relief could be granted with respect to Plaintiff's breach of contract claims in Counts 1 and 2 and misappropriation of trade secret claims in Counts 5 and 6. All the other proposed claims are futile. The

Plaintiff's motion will therefore be granted in part and denied in part. As the Court has concluded that all of the proposed claims against Defendant Premier are futile, the Court will dismiss the case against that Defendant.

### C. Defendants' Motion to Dismiss

Defendants have moved to dismiss Plaintiff's original Complaint. As the Court has found that Plaintiff should be permitted to supplement/amend the original complaint as discussed above, the original complaint is no longer the operative pleading. The Defendants' motion to dismiss is now moot. Moreover, the Court has considered the arguments that Defendants make regarding each of the claims in the original complaint in deciding Plaintiff's motion. The Court finds that Defendants' arguments regarding the breach-of-contract and misappropriation of trade secrets claims that remain in the complaint are unpersuasive with respect the original Complaint as well. The Court will therefore deny the Defendants' motion as moot.

## IV. CONCLUSION

For the reasons stated above, the Plaintiff's motion for reconsideration and for leave to supplement/amend the Complaint, dkt. # 39, is hereby **GRANTED** in part and **DENIED** in part, as follows:

1. Plaintiff's motion for reconsideration is hereby GRANTED in that the Court finds that personal jurisdiction as to Defendant Premier Biotech, Inc., is uncontested;

2. Plaintiff's motion to supplement/amend is granted with respect to Plaintiff's Claims in Counts 1, 2, 5, and 6 of proposed pleading; and

3. Plaintiff's motion to supplement/amend is DENIED is all other respects. The Court finds that supplementing or amending the Complaint to permit those other claims would be futile.

Defendant Todd Bailey's motion to dismiss the original pleading, dkt. # 38, is DENIED as moot.

Plaintiff shall file an Amended Pleading in the form proposed in Plaintiff's motion, but which includes only the claims against Defendant Todd Bailey, within 14 days of the date of this Order. Defendant shall answer the Amended Complaint within 21 days of the date upon which Plaintiff files the pleading. As a result of the Court's decision, Defendant Premier Biotech, Inc., is hereby DISMISSED from the case.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: September 27, 2018